F I L E D
United States Court of Appeals
Tenth Circuit

June 8, 2006

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

REX SHRUM,

       Plaintiff-Appellee,

v.

CITY OF COWETA, OKLAHOMA, a
Municipal corporation; STEVEN C.
WHITLOCK, individually,

       Defendants,

and

DERRICK PALMER, individually,

       Defendant-Appellant.

No. 04-7037

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. NO. 03-CIV-465-W)

---

John Howard Lieber, James C. Hodges and Shannan Pinkham Passley of Eller &
Detrich, P.C., Tulsa, Oklahoma for Defendants-Appellants.

James Patrick Hunt and Douglas D. Vernier of James R. Moore & Associates,
P.C., Oklahoma City, Oklahoma for Plaintiff-Appellee.

---

Before **BRISCOE, McWILLIAMS**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

Plaintiff-Appellee Rex Shrum is both a law enforcement officer and a clergyman. After eight apparently successful years of juggling the two responsibilities, his relationship with the management of the police department soured, and the Chief of Police allegedly rearranged Officer Shrum's work schedule so it would conflict with his duties as a minister. Forced to choose between his police and his ministerial responsibilities, Officer Shrum resigned from the police department and filed this lawsuit. We must now decide whether the City of Coweta and the Chief of Police violated Officer Shrum's constitutional rights to freedom of association, free exercise of religion, and substantive due process.

## I. FACTUAL BACKGROUND

Rex Shrum has served as pastor of the Coweta Church of Christ, in eastern Oklahoma, since April 1990. In 1994, he joined the police force of the City of Coweta. He arranged with his new employer to give him Wednesday evenings and Sundays off, so that he could continue to carry out his ministerial duties. He worked the day shift Monday through Friday as a detective. Officer Shrum was also a member of the local lodge of the Fraternal Order of Police (FOP), which was the certified bargaining agent for its members in the Coweta Police Department.

Problems arose over Officer Shrum's time sheets. He was supposed to put his time sheets in the report box of Assistant Chief of Police Derrick Palmer on Friday night, before leaving for the weekend, so the time sheets would be submitted by the 8:00 Monday morning deadline. Officer Shrum had repeatedly turned in time sheets late and had been reprimanded several times. On Monday morning, June 18, 2001, the records clerk in the Police Department could not find Officer Shrum's time sheet for the previous week. On this occasion Officer Shrum denied any wrongdoing. Another officer, Sergeant Mike Sullivan, stated that he saw Officer Shrum's time sheet in Assistant Chief Palmer's box. Nevertheless, Officer Shrum was suspended by the Department for three days without pay. His suspension was announced in a letter from Assistant Chief Palmer, dated June 22, 2001, which warned that further infractions would lead to "progressive disciplinary action." Officer Shrum filed a grievance, which the City denied and which was submitted to arbitration on September 12, 2001, in accordance with the collective-bargaining agreement between the City and the FOP.

On October 2, 2001, Officer Shrum was again suspended by Assistant Chief Palmer. This time, for submitting his time sheet late, he was suspended for five days without pay and put on probation for six months. Officer Shrum again filed a grievance. This grievance was later settled, with the City agreeing to pay Officer Shrum for the days he was suspended.

In early 2002 Officer Shrum was reassigned to work as a patrolman under Sergeant Joe Gist. In the new position he would continue on the day shift but would not have Sundays off. To clear Sundays for his ministerial duties, Officer Shrum asked Sergeant Gist for permission to move to the evening or midnight shift. Sergeant Gist agreed, provided that Officer Shrum could arrange with the evening or midnight shift supervisor to have an officer replace him on the day shift. Officer Shrum made the necessary arrangements with Sergeant Sullivan, who was the midnight shift supervisor and also the president of the FOP lodge. Another officer moved to the day shift; Officer Shrum worked the midnight shift and was off Sundays and Mondays.

On January 8, 2002, Officer Shrum received his semi-annual performance review. In his review of Officer Shrum six months earlier, Assistant Chief Palmer had marked two of the twelve evaluated areas as ones where "improvement is necessary": "Adherence to Policy" and "Interpersonal Relationship." His new supervisor, Sergeant Gist, conducted the January 8 review and marked the same two areas "unsatisfactory." In explaining the rating for "Adherence to Policy," Sergeant Gist noted that Officer Shrum had been "disciplined this period. However, [he has] not had any problems recently." For "Interpersonal Relationship," Sergeant Gist wrote that a "situation" with Officer Shrum had "go[ne] bad with another supervisor in [the] presence of subordinate

employees. Employee seems to have now resolved that situation." Assistant Chief Palmer signed and approved the performance review.

On January 29, 2002, the arbitrator reached a decision in the first time-sheet dispute. The arbitrator found that Officer Shrum had not been late in submitting his time sheet due on June 18, 2001, and that the City violated the collective-bargaining agreement by suspending him. The arbitrator directed the City to "rescind its discipline . . . in every respect," to make Officer Shrum whole, to "eliminate any record of this discipline" from his personnel file, and never to consider the event to Officer Shrum's detriment. Two weeks later, Palmer, who had been promoted to Chief of Police, wrote to Mr. Whitlock, the city manager, advising him to resist the arbitrator's decision until compelled by a court to comply. In his letter to Mr. Whitlock, Chief Palmer did not deny the substance of Officer Shrum's allegations; he insisted rather that the grievance was not timely filed. Meanwhile, Officer Shrum continued to work the midnight shift with Sundays and Mondays off, under the arrangement worked out with Sergeant Gist and Sergeant Sullivan.

On March 15, 2002, Chief Palmer wrote to Sergeant Gist that he was "very concerned" about Officer Shrum's "performance level." Chief Palmer directed Sergeant Gist to assign Officer Shrum to the day shift "for a minimum of 30 days" so he could receive "remedial training in supervision, ethics and interpersonal relationships." At his deposition, Chief Palmer could not recall the

specific problems with Officer Shrum's performance or the specific remedial training that was needed. Chief Palmer did recall that if Officer Shrum failed to work Sundays under this new arrangement, he could be fired.

Remedial training was also ordered for Sergeant Sullivan, who had testified in Officer Shrum's favor at arbitration. Sergeant Sullivan received a negative review in February 2002, was demoted and assigned remedial training in March 2002, and was fired in April 2002. An arbitrator ordered his reinstatement and called the case "a classic example of what not to do when administering discipline." The arbitrator later reiterated the order and found that Sergeant Sullivan's halting reinstatement had been marked by "the taint of retaliation."

On March 17, two days after the letter from Chief Palmer, Sergeant Gist instructed Officer Shrum to begin working the day shift on March 19. Concerned about a conflict with his ministerial duties, Officer Shrum asked Sergeant Gist whether he could continue to have Sundays off. The parties dispute Sergeant Gist's answer. The Defendants maintain that Sergeant Gist told Officer Shrum that he could not take Sundays off because a more senior officer had selected that day, and according to the collective-bargaining agreement off-days were selected by seniority. Officer Shrum's evidence is quite different. He submitted a deposition of Sergeant Gist to the effect that another officer was willing to trade Sunday shifts with Officer Shrum. According to Sergeant Gist, Chief Palmer

disapproved, insisting that Officer Shrum work on Sundays so that he could be monitored.

On March 22, 2002, Officer Shrum wrote a resignation letter to Chief Palmer, effective April 3, 2002. In the letter, Officer Shrum described his hiring in 1994 as being done "with the understanding by both the chief of police, and the city manager that my responsibilities at the Church had to be met," and he described the ease with which his ministerial duties had been accommodated. According to Officer Shrum, in his eight years on the force he had created no problems and caused no complaints from other officers. Nevertheless, Officer Shrum said he was resigning because of Chief Palmer's "continued religious harassment"—"by forcing me to work on Sunday you have given me no other choice."

On August 22, 2003, Officer Shrum filed this suit in federal district court. He brought many claims: violations of his federal constitutional rights of free speech, freedom of assembly/association, and free exercise of religion; violation of the Oklahoma Fire and Police Arbitration Act; wrongful termination against public policy; violation of the Oklahoma Constitution; lack of substantive due process; intentional infliction of emotional distress; and violation of the Oklahoma Religious Freedom Act. Officer Shrum sought actual and compensatory damages from the City and actual, compensatory, and punitive

damages from Chief Palmer and from the City Manager, Mr. Whitlock, both of whom he sued in their individual capacities.

By consent of the parties, the case was presided over by a Magistrate Judge, whose decision will be referred to as that of the district court. *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c)(3). The Defendants moved for summary judgment on all claims. The district court granted the motion in part, dismissing all claims against Mr. Whitlock on qualified immunity grounds, dismissing the First Amendment free speech claim and the equivalent claim under the state constitution, dismissing the claim under the Oklahoma Fire and Police Arbitration Act, and dismissing the state tort law claims of wrongful termination and intentional infliction of emotional distress. The district court allowed Officer Shrum to proceed against the City and against Chief Palmer on three of his federal claims—freedom of association, free exercise of religion, and substantive due process—and on the state law claims that track them. Chief Palmer appeals the partial denial of his motion for summary judgment on the federal constitutional claims on qualified immunity grounds.

## II. JURISDICTION AND STANDARD OF REVIEW

Orders denying qualified immunity before trial are appealable only to the extent they resolve abstract issues of law. *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). An interlocutory appeal is improper when the question is the sufficiency of the evidence or the correctness of the district court's findings with respect to a

genuine issue of material fact. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Because Chief Palmer argues that he is entitled to qualified immunity even under the Plaintiff's version of the facts, we have jurisdiction to hear this appeal notwithstanding its interlocutory character. *DeAnzona v. City of Denver*, 222 F.3d 1229, 1233 (10th Cir. 2000). Our inquiry on interlocutory qualified immunity appeals is limited, however, to "abstract issues of law." *Johnson*, 515 U.S. at 317. We must "take, as given, the facts that the district court assumed when it denied summary judgment" to the Defendant. *Id.* at 319.

Government officials are entitled to qualified immunity from liability for civil damages under § 1983 when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We review de novo a denial of a summary judgment motion raising qualified immunity questions. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001). Once a defense of qualified immunity has been raised, we consider two questions: (1) whether the alleged conduct violated a constitutional right, and if so, (2) whether the law was clearly established at the time of the defendant's actions. *Saucier v. Katz*, 533 U.S. 194 (2001). We address each of these questions for Officer Shrum's claims of freedom of association, free exercise, and substantive due process.

## III. FREEDOM OF ASSOCIATION

Officer Shrum's first claim against Chief Palmer is based on interference with his First Amendment freedom of association—specifically, his association with a labor union, the Fraternal Order of Police. He alleges that the Defendants assigned him to Sunday duty in retaliation for his membership in the union and his invocation of his collective bargaining rights.[1]

In the slightly different context of free speech claims by public employees, the Supreme Court has formulated the four-part balancing test of *Pickering v. Bd. of Education*, 391 U.S. 563 (1968); *see Connick v. Myers*, 461 U.S. 138, 142 (1983). One requirement for such a claim is that the speech address a matter of public concern. *Id*. at 568. Neither this Court nor the Supreme Court has determined, as a general matter, whether *Pickering*'s public concern requirement applies to freedom of association claims. *See Schalk v. Gallemore*, 906 F.2d 491, 498 & n.6 (10th Cir. 1990) (requiring public concern where the "association" was "nothing more nor less than an audience" for the employee's speech but explicitly declining to hold that public concern is always required); *Flanagan v. Munger*, 890 F.2d 1557, 1564 n.7 (10th Cir. 1989) (expressing "some doubt whether the

---

[1]Plaintiff raises no claims under the federal labor laws.

*Pickering* test, particularly the public concern prong, applies in freedom of association cases").[2]

That question has divided the Courts of Appeals.[3] In this case, however, we need not reach the broader question. In the specific context of public employee labor unions, this Court has rejected the requirement that a worker demonstrate that his association with the union be a matter of public concern. In *Butcher v. City of McAlester*, 956 F.2d 973 (1992), we upheld a jury verdict in favor of a public employee union member's freedom of association claim without applying the public concern test. Three firemen sued the city of McAlester, Oklahoma, for violating their First Amendment right to participate in union activities. *Id.* at 975 (styling the constitutional interest a "first amendment right

---

[2]We have subsequently reserved the question in several unpublished opinions. *See, e.g.*, *Lunow v. City of Oklahoma City*, 61 Fed.Appx. 598, 606 (10th Cir. 2003).

[3]Five Circuits have adopted the public concern requirement for freedom of association claims and two have not. *See Hudson v. Craven*, 403 F.3d 691 (9th Cir. 2005) (applying the public concern test to hybrid speech/association claims); *Cobb v. Pozzi*, 363 F.3d 89, 102-103 (2d Cir. 2004) (applying the public concern test to association claims); *Edwards v. City of Goldsboro*, 178 F.3d 231, 249-50 (4th Cir. 1999) (same); *Griffin v. Thomas*, 929 F.2d 1210, 1214 (7th Cir. 1991) (same); *Boals v. Gray*, 775 F.2d 686 (6th Cir. 1985) (same). *But see Breaux v. City of Garland*, 205 F.3d 150, 157 n.12 (5th Cir. 2000) (not applying the public concern test to association claims); *Hatcher v. Bd. of Pub. Educ. and Orphanage*, 809 F.2d 1546, 1558 (11th Cir. 1987) (same). *See also Akers v. McGinnis*, 352 F.3d 1030, 1044 (6th Cir. 2003) (Clay, J., concurring and dissenting) (criticizing the application of the public concern test to some associational claims); *Balton v. City of Milwaukee*, 133 F.3d 1036, 1040 (7th Cir. 1998) (suggesting that the issue be reexamined).

to peaceably assemble . . [and] to participate in the activities of Local 2284").

Among other arguments, the city insisted that the firemen had no constitutional claim because their union activities were not protected under *Pickering*. *Id*. at 979. We rejected that argument. *Id*. at 979-80. *See also Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434 (10th Cir. 1990) (reversing a grant of summary judgment to a defendant on a union association claim without applying the public concern test).

In these cases we offered no lengthy explanation for not applying the public concern test, but we did emphasize the self-imposed character of the collective-bargaining agreement. We noted that the city had "no license, where there is a collective-bargaining agreement, to embark on union-busting activities." *Butcher*, 956 F.2d at 979. The reason is apparent. The *Pickering* test is predicated on the government's "interests as an employer in regulating the speech of its employees," which "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. Those interests relate to "the efficiency of the public services it performs through its employees." *Id*. Where a public employer has negotiated with an employee union and signed a collective-bargaining agreement, it has contractually agreed to the legitimacy of the union and of its employees' association with the union. The public employer has presumably received the benefit of its bargain, and is estopped from claiming that its "interests as an employer" are inconsistent with

-12-

the freedom of its employees to associate with the union or to file grievances in accordance with its procedures. *See Butcher*, 956 F.2d at 979 (once a public employer signs a collective bargaining agreement, it no longer can assert a "legitimate interest in whether its firefighters elected to join the union and participate in its activities"). If a public employer retaliates against an employee for engaging in acts protected by the collective-bargaining agreement—as Officer Shrum alleges here—then the employer cannot rely on the *Pickering* test to avoid First Amendment scrutiny.

Not only does the First Amendment freedom of association protect public employees from retaliation for participation in a union with which their employers have signed a collective-bargaining agreement, *Butcher*, 956 F.2d at 980, but as this Court held in *Morfin*, 906 F.2d at 1439, "[t]he unconstitutionality of retaliating against an employee for participating in a union [is] clearly established." We therefore affirm the district court's denial of summary judgment on Officer Shrum's freedom of association claim.

On remand, the district court should neither require "public concern" nor engage in judicial balancing of the government's interest in efficient operations against the Officer Shrum's interest in union association. The City of Coweta already balanced those interests when it agreed to a collective bargaining agreement. The Defendants are estopped from reneging on this agreement, either by claiming that union association is not a matter of public concern or by saying

that its interest in efficient operations outweighs Officer Shrum's right to union association.

## IV. FREE EXERCISE OF RELIGION

The district court also denied Chief Palmer's motion for summary judgment on Officer Shrum's free exercise claim, based on qualified immunity. The court offered two rationales. First, it noted that "at least one court has found 'any religious activities of employees that can be accommodated without undue hardship to the governmental employer, *see* 42 U.S.C. § 2000e(j), are also protected by the first amendment.'" Order, at 13 (quoting *Brown v. Polk County, Iowa*, 61 F.3d 650, 654 (8th Cir. 1995) (en banc)). Second, the court noted that there is a factual dispute regarding whether Officer Shrum's "attempted exercise of his religious freedoms guaranteed by the First Amendment, and Defendants' knowledge of that attempt, was a motivating factor in the actions taken against him." *Id.* Chief Palmer urges two grounds for reversing the district court's denial of summary judgment.

### A. Applicability of the Free Exercise Clause to Executive Action

Chief Palmer first offers the intriguing assertion that the Free Exercise Clause protects citizens only from "enactment or enforcement of any law, regulation or ordinance," and not from the actions or decisions of an executive official, such as the decision to move Officer Shrum to the day shift and to forbid him from trading shifts with another officer. This argument is predicated on a

-14-

narrow reading of the first and fifth words of the First Amendment: "*Congress shall make no law . . . .*" U.S. Const., Amend. I. Congress is the legislative branch, and the Amendment is directed at the making of "law." Even after incorporation of the First Amendment against the states, Appellant evidently is arguing, the Amendment applies only to federal, state, and local legislative activity and the direct enforcement thereof, and not to the independent exercise of executive functions.

The Supreme Court has never explicitly held that the Free Exercise Clause applies to executive action, though it has assumed on countless occasions that it does. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) (decision by Forest Service to build a road through territory sacred to certain Indian tribes); *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707 (1981) (decision by state unemployment compensation commission to deny benefits to a worker unemployed on account of religious scruples); *Cruz v. Beto*, 405 U.S. 319 (1972) (administrative actions by prison officials affecting Buddhist prisoner); *Sherbert v. Verner*, 374 U.S. 398, 407 (1963) (denial of unemployment compensation); *cf. Pickering, supra* (free speech claim arising from executive personnel action); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) (reviewing executive action under the Free Exercise Clause). Professor Leonard Levy posed the question without offering any clear resolution:

[T]he First Amendment, when read literally, raises the question whether any special significance should be attached to the fact that the prohibition on power was imposed exclusively upon *Congress* instead of upon the government of the United States. Did the specification of Congress imply that restraints were not intended to be imposed upon other federal authorities?

Leonard W. Levy, *Legacy of Suppression: Freedom of Speech and Press in Early American History* 233-34 (1960) (emphasis in original).

The answer to Chief Palmer's argument and Professor Levy's question, we believe, is that the First Amendment applies to exercises of executive authority no less than it does to the passage of legislation. The drafters' use of the term "Congress" was a result of two structural decisions: to limit the reach of the First Amendment (as well as other protections of personal rights in the first eight amendments) to the federal government, and to set forth these freedoms as a freestanding Bill of Rights, separate from the main body of the constitutional document. Neither of these evinced any intention to confine the Amendment to actions of the legislative branch.

The early state constitutions, on which the First Amendment was patterned, uniformly applied their versions of the Free Exercise Clause to all branches of government. *See The Complete Bill of Rights: The Drafts, Debates, Sources, & Origins* 13-52 (Neil H. Cogan ed., 1997) (quoting the religious freedom provisions in the constitutions and charters of all thirteen original states). The Delaware Declaration of Rights of 1776, § 2, for example, provided "that no

authority can or ought to be vested in, or assumed *by any power whatever* that shall in any case interfere with, or in any manner controul the right of conscience in the free exercise of religious worship." *Id.* at 15 (emphasis added). The New York Constitution of 1777, § XXXVIII, provided "[t]hat the free Exercise and Enjoyment of religious Profession and Worship, without Discrimination or Preference, shall forever hereafter be allowed within this State to all Mankind." *Id.* at 26. The Pennsylvania Constitution of 1790, Art. IX, § 3, adopted contemporaneously with the First Amendment, provided "that *no human authority* can, in any case whatever, controul or interfere with the rights of conscience." *Id.* at 33 (emphasis added).

The first draft debated in the House of Representatives of what was later to be the Religion Clauses read: "No religion shall be established by law, nor shall the equal rights of conscience be infringed." 1 *Annals of Cong.* 757 (Aug. 15, 1789) (Joseph Gales ed., 1834). It was proposed as an amendment to Article I, § 9, which sets forth limitations on the powers of the federal government. The proposal came under criticism because of the fear that it might be interpreted as a limitation on state governments, many of which then had establishments of religion of some sort. Moreover, for independent reasons, the First Congress decided that the proposed amendments should be attached to the end of the document, rather than interpolated within it; this exacerbated the federalism problem because it was only the placement of the religion amendment within

Article I, § 9 that confined its reach in any way to the federal government. Madison suggested that the problem could be most easily resolved by adding the word "national" to the proposal, so that it would read that "no national religion shall be established by law," 1 *Annals of Cong*. 758-59, but this idea encountered opposition from those still sensitive to the consolidationist implications of the word "national." *See id.* at 759 (statement of Rep. Gerry).[4] The solution was to employ the word "Congress," thus making clear that the limitations of what is now the First Amendment did not apply to the States. (That limitation to the federal government, of course, was later abrogated by incorporation of the First Amendment against the States through the medium of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303-304 (1940).)

As this history shows, there was no intention to confine the reach of the First Amendment to the legislative branch. Indeed, the first time anyone in Congress explicitly argued that the strictures of the First Amendment applied only to the passage of a "law"—in 1836, in connection with the right of petition[5]—the suggestion was roundly rejected ("with ridicule," according to the leading scholar

---

[4]At the Constitutional Convention, in response to anti-nationalist sensitivities, the Framers carefully deleted every mention of the words "nation" or "national" that had appeared in the Randolph Plan. 1 *Records of the Federal Convention* 335, 336, 404 (Max Farrand ed., 1911).

[5]12 *Reg. Deb.* 472, 475 (1936) (Sen. Gabriel Moore, arguing that the refusal of Congress to receive petitions against slavery did not violate the First Amendment right of petition because Congress was forbidden only to pass "laws" and the refusal to receive a petition was not a law).

on constitutional debates in Congress). See David P. Currie, *The Constitution in Congress: Descent Into the Maelstrom, 1829-1861*, at 9 (2005).

One scholar has argued that the legislative history of the Establishment Clause shows that "[t]he word 'Congress' was intentionally inserted to limit the scope of the restrictions on the government to that single branch." Mark. P. Denbeaux, *The First Word of the First Amendment*, 80 Nw. U. L. Rev. 1156, 1169-70 (1986). Professor Denbeaux bases his argument on a remark by Representative Huntington of Connecticut, a state that at the time had an establishment of religion in the form of compulsory taxation for the support of religion. *See* Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* 178, 183-84 (1986). Huntington feared that the original version of the religion amendment would lead to federal lawsuits preventing enforcement of the "bylaws" that had been enacted "for a support of ministers, or building of places of worship." 1 *Annals of Cong.* 758. The substitution of the word "Congress" came shortly after Huntington's remark and can be seen as a response to it. *See id.* at 796. We cannot agree with Professor Denbeaux's interpretation of this incident. Huntington's concern stemmed from uncertainty over whether the proposal would extend to state establishments, not over any particular concern about a particular branch of the federal government. At this juncture, the Judiciary Act had not yet been enacted, and Huntington presumably assumed that the federal courts would be vested with the full

jurisdiction implied by Article III—to all cases "arising under the Constitution."

He thus worried that an opponent of the Connecticut establishment could go to

federal court, invoke the proposed language "no religion shall be established by

law," and obtain an injunction or other relief preventing enforcement of the

obligation to pay for support of ministers and buildings of worship.[6] His concern

was satisfied by confining the reach of the religion proposal to the federal

government. Indeed, after the proposal was further amended to forbid any "law

respecting the establishment of religion," which prohibited the federal

government both from establishing religion at the federal level and from

interfering with establishments at the state level, see Akhil R. Amar, *The Bill of

Rights: Creation and Reconstruction* 32-33 (1998), confining the reach of the

amendment to the legislative branch would have been perverse from Huntington's

point of view.

Moreover, even if the First Amendment itself applied narrowly only to

Congress and only to the making of "laws," this would not be the end of the

matter. The Fifth Amendment, which undoubtedly applies to the executive

branch, provides that "no person shall be deprived of life, liberty, or property

---

[6]Huntington made his remark on August 15, 1789. The House debate on the Judiciary bill did not begin until August 24, 1 *Annals of Cong.* 812, and the bill was not adopted until September 24, 1 *Stat.* 73. The Act did not vest the federal courts with general federal question jurisdiction, and thus, under the Act, Huntington's feared lawsuit could not arise unless somehow diversity jurisdiction could be contrived.

without due process of law." This means, among other less obvious things, that executive officials cannot abridge a person's liberty (including freedom of religion) except in accordance with "law." *See* Edward S. Corwin, *The Doctrine of Due Process of Law Before the Civil War*, 24 Harv. L. Rev. 366 (1911); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 US. 579, 646 (1952) (Jackson. J., concurring). Thus, if the First Amendment forbids the making of "law" that infringes the free exercise of religion, and the Due Process Clause forbids the executive from taking away liberties except pursuant to "law," it follows that the First Amendment protects against executive as well as legislative abridgement. Indeed, because executive action that bears upon the private rights of individuals is almost always grounded in some statutory authority, a challenge to the executive action may be characterized as an as-applied challenge to the statute. *Cf.* Denbeaux, 80 Nw. U. L. Rev. at 1157 n.1. In substance, Officer Shrum's challenge to the executive actions of Chief Palmer is a constitutional challenge to the statutory grant of power to the Chief of Police to supervise employees, as applied in the circumstances of this case.

For all of these reasons, we reject the argument that Chief Palmer's actions are not covered by the First Amendment because they did not constitute the enactment or enforcement of any law, regulation, or ordinance.

**B. Neutrality and General Applicability**

Chief Palmer's second argument for reversal is that the relevant regulations and actions in this case were "neutral and generally applicable" within the meaning of *Employment Division v. Smith*, 494 U.S. 872 (1990). "The transfer of an officer to the day shift, without more, is neutral on its face," and "[t]he CBA [collective bargaining agreement] and its rank-takes-precedence rule for determining days off are also religion-neutral." Appellant challenges the district court's conclusion that the failure of a government employer to accommodate the religious needs of an employee, short of undue hardship, is a violation of the First Amendment. *See* Order, at 13. He argues that *Brown v. Polk County, Iowa*, 61 F.3d 650, 654 (8th Cir. 1995) (en banc), on which the district court relied, "contradicts the teaching" of this Court in *United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) (en banc), that "*Smith* creates a 'safe harbor' if the law is 'a valid and neutral law of general applicability.'" Appellant's Br. 21.

We agree with Appellant Palmer that the mere failure of a government employer to accommodate the religious needs of an employee, where the need for accommodation arises from a conflict with a neutral and generally applicable employment requirement, does not violate the Free Exercise Clause, as that Clause was interpreted in *Smith*. We thus respectfully disagree with the Eighth Circuit that "the first amendment protects at least as much religious activity as Title VII does." *Brown*, 61 F.3d at 654. The religious accommodation

-22-

requirements of Title VII, 42 U.S.C. § 2000e(j), extend beyond the dictates of the Free Exercise Clause, as interpreted by *Smith*. 494 U.S. at 878-82. Thus, the mere refusal of Chief Palmer and the Coweta police department to accommodate Officer Shrum's religious scheduling needs, without more, does not establish a constitutional violation.

But that is not the crux of Officer Shrum's case. Officer Shrum alleges that he was moved to the day shift precisely because of Chief Palmer's knowledge of his religious commitment. If so, the decision to transfer was not "neutral," but rather motivated by Officer Shrum's religious commitments. We recognize that Chief Palmer asserts neutral reasons for his decision to require Officer Shrum to work the day shift: that he was concerned about Officer Shrum's "performance level" and he needed "remedial training." But these asserted neutral reasons are disputed. At his deposition, Chief Palmer could not recall any specific problems with Officer Shrum's performance or the specific remedial training that was needed. R. 380-81. Officer Shrum presented evidence that another officer had been willing to trade shifts with him but that Chief Palmer would not permit it, R. 259, 381, and thus that the decision was not merely a neutral application of the "rank-takes precedence" rule of the CBA.

The district court concluded that the relevant "facts are disputed," and the ultimate outcome of the case will turn on whether Officer Shrum's religious commitment "was a motivating factor in the actions taken against him." Order, at

-23-

13. For purposes of interlocutory appellate review, the question before us is not whether Chief Palmer's account is worthy of belief, or even if the district court was correct that there was a disputed question of material fact on this point, but only whether, assuming the district court's evaluation of the record was correct, Officer Shrum has stated a constitutional claim strictly as a matter of law. We hold that the district court was correct that Officer Shrum's allegations establish a violation of his clearly established constitutional rights under the Free Exercise Clause.

To be sure, Officer Shrum does not allege that Chief Palmer held Officer Shrum's faith against him or acted from religious prejudice. Rather, the claim is that religious discrimination was the means to an entirely secular end: Chief Palmer wanted to force Officer Shrum out, and making him choose between his duties as a police officer and his duties as a minister was the method at hand. But the Free Exercise Clause is not limited to acts motivated by overt religious hostility or prejudice. As its language suggests, the animating ideal of the constitutional provision is to protect the "free exercise of religion" from unwarranted governmental inhibition whatever its source. The first draft, as it came from the pen of James Madison, was even more emphatic: "nor shall the full and equal rights of conscience be *in any manner, or on any pretext*, infringed." 1 *Annals of Cong.* 451 (June 8, 1789) (speech by Rep. Madison) (emphasis added). Representative Daniel Carroll of Maryland—not coincidentally, as a Roman

-24-

Catholic, the most conspicuous example in the First Congress of a member of a religious minority—commented that "the rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand." 1 *Annals of Cong.* 757 (Aug. 15, 1789).

True to this history, the Free Exercise Clause has been applied numerous times when government officials interfered with religious exercise not out of hostility or prejudice, but for secular reasons, such as saving money,[7] promoting education,[8] obtaining jurors,[9] facilitating traffic law enforcement,[10] maintaining morale on the police force,[11] or protecting job opportunities.[12] Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged governmental action is not neutral, *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294

---

[7]*Sherbert v. Verner*, 374 U.S. 398 (1963).

[8]*Wisconsin v. Yoder*, 406 U.S. 205 (1972).

[9]*In re Jenison*, 375 U.S. 14 (1963) (per curiam).

[10]*Quaring v. Peterson*, 728 F.2d 1121 (8th Cir.1984), *aff'd sub nom. Jensen v. Quaring*, 472 U.S. 478 (1985) (per curiam affirmance by an equally divided Court).

[11]*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366-67 (3rd Cir. 1999) (Alito, J.).

[12]*Tomic v. Catholic Diocese of Peoria*, — F.3d —, 2006 WL 851640 (7th Cir. April 4, 2006); *Rayburn v. General Conference of Seventh-Day Adventists*, 722 F.2d 1164 (4th Cir. 1985).

(10th Cir. 2004), but the Free Exercise Clause is not confined to actions based on animus.

This brings us to the question of whether the law on this constitutional violation was clearly established. Chief Palmer's argument for qualified immunity reiterates his legal argument that his actions were neutral and generally applicable, an argument which we have rejected as a matter of law. Chief Palmer does not dispute that it was clearly established that non-neutral state action imposing a substantial burden on the exercise of religion violates the First Amendment. If Officer Shrum's factual allegations are correct—that he was singled out precisely because of Chief Palmer's knowledge of his religious commitment—then Chief Palmer's claim of qualified immunity must fail. Only if the finder of fact ultimately concludes, as a matter of fact, that Chief Palmer had a neutral basis for his personnel actions, does he have a defense. This is thus a case where the claim of qualified immunity collapses into the merits. The district court was correct to hold that it should proceed to trial on the free exercise claim.

## V. SUBSTANTIVE DUE PROCESS

Officer Shrum's final claim is that his substantive due process rights were violated. We have not yet decided which property interests in employment are protected by substantive due process, *see Hennigh v. City of Shawnee*, 155 F.3d 1249, 1257 (10th Cir. 1998), and we need not decide the question today. Officer Shrum's substantive due process claim restates his other constitutional claims at a

higher level of abstraction. Where a plaintiff has recourse to an "explicit textual source of constitutional protection," *Graham v. Connor*, 490 U.S. 386, 395 (1989), a more general claim of substantive due process is not available. *See County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003). Without a constitutional claim, we need not consider whether the law was clearly established. *See Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 341 F.3d 1197, 1200 (10th Cir. 2003).

We **AFFIRM** the denial of summary judgment on the freedom of association and free exercise claims, **REVERSE** the denial of summary judgment on the substantive due process claim, and **REMAND** for further proceedings not inconsistent with this opinion.

No. 04-7037, <u>Rex Shrum v. City of Coweta, et al.</u>

**BRISCOE**, J., concurring:


I write only to address Chief Palmer's textual argument that the free exercise clause is not implicated because Shrum is not challenging the enactment or enforcement of any law, regulation, or ordinance. I would reach the same conclusion on the issue as the majority, but I would rely instead upon our decision in <u>Axson-Flynn v. Johnson</u>, 356 F.3d 1277 (10th Cir. 2004), and prior Supreme Court cases. Chief Palmer devotes a mere paragraph to his textual argument, without citation to any legal authority other than the text of the First Amendment. Shrum's brief does not even respond to the argument. In my view, it is sufficient to note, as the majority has, that the Supreme Court has assumed on several occasions that the free exercise clause is not as restricted as Chief Palmer suggests here. More recently, in <u>Axson-Flynn</u>, we assumed that the free exercise clause was not restricted to challenges involving a law, regulation, or ordinance. There, the plaintiff brought a 42 U.S.C. § 1983 action against the staff of the University of Utah's Actor Training Program, alleging, in part, that the staff forced her to say offensive words contrary to her religious beliefs in violation of the free exercise clause. <u>Id.</u> at 1294. We concluded that a genuine issue of material fact existed as to whether the staff's requirement that students perform acting exercises as written was pretextual or a neutral rule of general applicability. <u>Id.</u> In a footnote, we clarified that our "use of the word "rules" . . .

mean[t] a state's or state actor's laws, regulations, or other policies which act on private persons." Id. at 1294 n.17.  As is evident from Axson-Flynn, government conduct is subject to the free exercise clause's protections.