FILED
United States Court of Appeals
Tenth Circuit

December 13, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID M. LAUCK,

        Plaintiff - Appellant,

v.

CAMPBELL COUNTY; CAMPBELL COUNTY SHERIFF'S DEPARTMENT; WILLIAM POWNALL, individually and in his official capacity as Campbell County Sheriff,

        Defendants - Appellees.

No. 09-8085

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 2:08-CV-00253-ABJ)**

---

Elbert Allen Dodd, Jr., Scruggs, Dodd & Dodd, Fort Payne, Alabama, for Plaintiff - Appellant.

Judith A. Studer, Schwartz, Bon, Walker & Studer, LLC, Casper, Wyoming, for Defendants - Appellees.

---

Before **HARTZ**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Contending that he was improperly transferred and constructively discharged, former Deputy Sheriff David Lauck sued Campbell County, the Campbell County Sheriff's Office (CCSO), and Campbell County Sheriff William Pownall (collectively, Defendants). He brought a state-law breach-of-contract claim and civil-rights claims under 42 U.S.C. § 1983 alleging a denial of procedural due process and retaliation for speech protected by the First Amendment.[1] The United States District Court for the District of Wyoming granted Defendants' motion for summary judgment, and Mr. Lauck appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. Mr. Lauck's transfer did not violate his contractual rights. His claim that he was demoted and constructively discharged in violation of due process fails because he did not produce sufficient evidence that he was constructively discharged, was entitled to a hearing, or was provided an inadequate hearing. And there is no merit to his First Amendment claim because he identifies only one instance of speech that may be constitutionally protected, and he has not shown a causal connection between that speech and the allegedly retaliatory action by Defendants.

## I. BACKGROUND

We begin with a brief overview of the relevant facts. Additional facts will be presented in the discussions of the specific issues.

---

[1]He also claimed intentional infliction of emotional distress, but he has not appealed the dismissal of that claim.

Mr. Lauck was an employee of the CCSO for 22 years, rising to the rank of Deputy Sheriff III. He was designated a "Lead Officer" on his shift from 1994 until just before his employment ended on November 17, 2006. According to him, he frequently criticized improper conduct by other officers.

The event precipitating the end of Mr. Lauck's employment was Sheriff Pownall's decision to transfer him to the Civil Process Division. In this new position he would retain his pay and his rank as a Deputy Sheriff III, but would no longer be a Lead Officer. Captain Roy Seeman met with Mr. Lauck for over an hour on November 15, 2006, to advise him of plans to transfer him to the Civil Process Division and the reason for the transfer. The next day, Sheriff Pownall had a follow-up meeting that also lasted about an hour. He explained to Mr. Lauck the reasons for the transfer and ordered him to assume the duties of a deputy sheriff in the Civil Process Division. Mr. Lauck, who thought that the transfer was retaliation for his complaints about other officers, responded, "No thanks." R., Vol. 1 pt. 4 at 673. The sheriff said that he should show up for the new position or "turn [his] stuff in." *Id.* Mr. Lauck did not report to duty in that division. On November 18, 2006, two documents were found on Captain Seeman's desk: a letter in which Mr. Lauck claimed that he had been fired and a list of equipment he returned. Through his attorneys, Mr. Lauck requested a hearing. The request was granted, but he did not appear for the hearing.

## II. DISCUSSION

We review *de novo* a grant of summary judgment, applying the same standard that governs the district court. *See Brammer-Hoelter v. Twin Peaks Charter Acad.,* 602 F.3d 1175, 1184 (10th Cir. 2010). Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). We consider each claim in turn.

## A.    Contract Claim

Mr. Lauck did not have a written contract for his position as a deputy sheriff. The district court stated, however, that the parties did not dispute that he had a contract "governed by the Campbell County Sheriff's Office Policy and Procedural Manual [the Manual] and the relevant Wyoming Statutes." R., Vol. 1 pt. 5 at 1012. Of central importance is Wyo. Stat. Ann. § 18-3-611(b) (1977), which states:

> A deputy sheriff shall not be discharged from employment, reduced in rank or suspended without pay except for cause and after notice and opportunity for a hearing. The hearing and any appeal shall be conducted in accordance with the Wyoming Administrative Procedure Act. The hearing shall be closed unless both the sheriff and the deputy involved agree otherwise.

Mr. Lauck bases his contract claim on the contention that he was demoted without cause and without a prior hearing.[2] His alleged reduction in rank was the

---

[2]Mr. Lauck's reply brief on appeal argues that he was terminated in violation of his contract. But we decline to address the claim because he failed to argue the issue in his opening brief. *See United States v. Murray*, 82 F.3d 361,

(continued...)

reassignment to the Civil Process Division. Sheriff Pownall, however, submitted an affidavit saying that Mr. Lauck's pay and his status as a Deputy Sheriff III would not have changed after the reassignment, and Mr. Lauck has submitted no contrary evidence. Rather, he makes two other arguments why his transfer constituted a demotion.

First, he points out that he would no longer be a Lead Officer. That position is described in the Manual: "Each uniformed shift will have a Lead Officer assigned by the Shift Sergeant. The purpose of the Lead Officer position is to act as a temporary shift supervisor during periods when the sergeant and corporal are off duty." R., Vol. 1 pt. 2 at 305. The prestige of the position is recognized in the Manual's provision that "[t]he designated Lead Officer will be issued a single chevron to wear while assigned to the shift in the position of Lead Officer." *Id.* But the Manual also states: "No rank is attached or implied by the designation of Lead Officer. No change in the pay schedule will occur with the designation." *Id.* And it clearly conveys that a Lead Officer has no right to retain that status. It states:

> *The duties of Lead Officer* are specific to the shift. The designated Lead Officer *may be changed at the discretion of the shift sergeant.*

[2](...continued)
363 n.3 (10th Cir. 1996) ("We decline to consider arguments raised for the first time in a reply brief."). In any event, the undisputed facts show that he refused to report to work after his transfer; so rather than being terminated, he simply abandoned his job. *See Carrington v. Mahan,* 51 F.3d 106, 107 (8th Cir. 1995); *Crady v. Liberty Nat. Bank & Trust Co.*, 993 F.2d 132, 134–35 (7th Cir. 1993).

*Reasons* for changing the lead officer *include*, but are not limited to the following circumstances[:]

    a.     Transfer of the Lead Officer to another shift;

    b.     *Transfer or change in the shift sergeant*;

    c.     Request by the Lead Officer to be removed from the position;

    d.     Promotion of the Lead Officer to a supervisory position;

    e.     Performance of the duties assigned to the Lead Officer do not meet the expectation of the shift sergeant.

*Id.* (emphasis added). Because the Manual permits the shift sergeant to change the Lead Officer at his discretion and it explicitly states that a change in the shift sergeant in itself is a proper ground for changing the Lead Officer, the Manual provides no justifiable expectation that a Lead Officer can retain the position just by performing the job well. In short, Mr. Lauck's position as Lead Officer was not protected by the contract arising from § 18-3-611 and the Manual.

Second, Mr. Lauck raises a public-policy argument to support his contract claim. He asserts that transfer to a position in the Civil Process Division causes a loss of status for a number of reasons: it is a position that people with medical problems generally fill, it is a dead-end job in which there is no chance of increase in rank, a civil process server is not considered a law-enforcement officer, and a Deputy Sheriff III has a variety of duties requiring years of experience, whereas serving civil papers can be done by any adult in Wyoming. As a result, he says, such a transfer was commonly known within the CCSO as a demotion. He asserts that it would violate public policy not to treat the transfer as a demotion because (1) protecting against such transfers "recognizes and

creates incentives for qualified officers to seek and hold the position," (2) "disfavoring demotions as punishment for outspoken officers can only increase public safety and help prevent injustice," and (3) "[p]unishing whistleblowing is not a favored public policy in any court." Aplt. Br. at 18.

Mr. Lauck's public-policy argument does not carry the day. As already noted, neither the Manual nor any statute prohibits transfers to less desirable positions with the same rank and pay. To be sure, such a transfer may violate public policy if it is motivated by a desire to retaliate against a whistleblower, racial prejudice, or the like. But in such circumstances it is the employer's motive that creates the cause of action. Because the employer's motive is improper, it may be liable even for doing something it has a contractual right to do. For example, a police chief may have a contractual right to assign an officer to the day shift (which includes working on Sundays); but if the assignment is motivated by a desire to hinder the officer's attendance at church, the police chief may be liable for violating the Free Exercise Clause. *See Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1143–44 (10th Cir. 2006). The cause of action, however, is not for breach of contract. *See, e.g.*, Restatement (Third) of Employment Law ch. 4 (Tort of Wrongful Discipline in Violation of Public Policy) (Tentative Draft No. 2 (revised), 2009). Although transfer of Mr. Lauck to the Civil Process Division may have been bad policy, he has failed to show the breach of any contractual obligation.

**B.	Due Process Claim**

Mr. Lauck next claims that Defendants violated his Fourteenth Amendment right to procedural due process by demoting and constructively discharging him. The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State . . . ; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citation omitted). "The fundamental requisite of due process of law is the opportunity to be heard." *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (internal quotation marks omitted). Its essence is the provision to the affected party of "some kind of notice and . . . some kind of hearing." *Id.* (emphasis omitted).

**1.	Demotion**

We can briefly dispose of Mr. Lauck's contention that he was denied due process by his transfer to the Civil Process Division. The Fourteenth Amendment, by its terms, guarantees due process only for the deprivation of "life, liberty, or property." U.S. Const. amend. XIV, § 1. Property is the only interest at issue here. A government employee may have a property interest in his position, but only if he has a "'legitimate claim of entitlement'" to that position.

*Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 565 (10th Cir. 2010) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "The general rule is that no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary." *Potts v. Davis Cnty.*, 551 F.3d 1188, 1192 (10th Cir. 2009) (internal quotation marks omitted). Because we have just held that there was no statutory or contractual constraint on Defendants' authority to transfer Mr. Lauck to his new position, the Due Process Clause does not apply to the transfer. His due-process claim founded on the transfer therefore must fail.

### 2. Constructive Discharge

Mr. Lauck's principal due-process claim is that he was constructively discharged. We have said that "[c]onstructive discharge occurs when a reasonable person in the employee's position would view the working conditions as intolerable. That is to say the working conditions, when viewed objectively, must be so difficult that a reasonable person would feel compelled to resign." *Id.* at 1194 (internal quotation marks omitted).[3] An employer who has created such intolerable conditions has breached its contract with the employee; and an employee who alleges such a violation of his property interest may be entitled to procedural due process.

---

[3] Although Mr. Lauck attempts to distinguish *Potts* from this case, he does not challenge its formulation of the test for determining whether an employee was constructively discharged.

But the nature of the right of procedural due process in the constructive-discharge context is peculiar and requires careful analysis. A constructive discharge differs in essential ways from a true discharge. When an employer decides to fire an employee, there is no ambiguity about the loss that the employee will suffer. If the employee has a property interest in the job, the government employer must provide proper notice and a hearing before the firing is effected. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). In the constructive-discharge context, however, the employer may not even know that its actions have compelled the employee to quit. When that is the case, the employer can hardly be required to provide notice or a hearing before the resignation; after all, the employer does not realize that the employee's employment is ending. Moreover, because negligent conduct does not implicate the Due Process Clause, *see County of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998); *Daniels v. Williams,* 474 U.S. 327, 330–31 (1986), the unintentional, unknowing creation of intolerable working conditions cannot be the predicate of a due-process claim. *See Fowler v. Carrollton Pub. Library*, 799 F.2d 976, 980 (5th Cir. 1986).[4]

---

[4]Of course, knowledge of the intolerable conditions may come from the employee; and we will assume, without deciding, that a hearing may be required when the employee provides notice of such conditions (a reversal of the usual requirement that the *employer* give notice).

This is not to say that there is no such thing as a due-process constructive-discharge claim. One can be based on the employer's intentionally or knowingly creating working conditions so intolerable that a reasonable employee would quit. An employer cannot circumvent the due-process requirements that would attend a true firing by trying to compel a resignation in a manner that violates the employee's property (that is, contract) rights. *See id*. at 981 ("Constructive discharge in a procedural due process case constitutes a § 1983 claim only if it amounts to forced discharge to avoid affording pretermination hearing procedures.").

We do, however, part ways with Mr. Lauck's apparent belief that a constructive discharge in itself constitutes a violation of due process. As the above analysis shows, a due-process constructive-discharge claim requires more. There are three elements that the former employee must establish to have a claim: First, he must show that a property right was violated. In this context the requirement is that he prove that the resignation was a constructive discharge—that is, the former employee resigned because of conditions so intolerable that a reasonable person would feel compelled to resign. Second, the employee must establish the *mens rea* necessary for a due-process violation—that the employer knew or intended (or perhaps was on notice) that such intolerable conditions were being imposed on the employee. Third, the employee must show that he was denied the necessary procedure—that the employer did not conduct an

appropriate hearing to determine whether its actions would violate the employee's contractual rights.

Mr. Lauck has failed to establish any of the three elements. To begin with, he has not presented evidence from which a reasonable juror could infer that a reasonable person would find the working conditions in the Civil Process Division intolerable. On the contrary, it is undisputed that the job would allow him to continue to investigate crimes and make arrests; and he would be able to work alone, would no longer be assigned to night shifts, and would have weekends off. Mr. Lauck may not have wanted such work, but that is not the test.

Likewise, Mr. Lauck has not shown that Sheriff Pownall knew that the working conditions for Mr. Lauck would be intolerable to a reasonable person. Although he asserts that Sheriff Pownall ordered the transfer with the purpose of causing him to resign, he had no contractual protection against the transfer unless it would make the job intolerable for a reasonable person. Mr. Lauck may have properly felt slighted—even wounded—by the transfer; and Sheriff Pownall may have anticipated such a reaction. But the sheriff did not knowingly violate Mr. Lauck's property rights unless he knew that what he was imposing on Mr. Lauck would cause a reasonable person to resign. Due process did not protect against an injury, even an intentionally inflicted injury, to Mr. Lauck's pride or ego arising from the transfer unless the sheriff knew that the transfer

-12-

would be so humiliating to a reasonable person as to make the new position intolerable.

Finally, Mr. Lauck has not demonstrated, or even argued, that he was not provided an adequate hearing. His discussions about the transfer with Captain Seeman and Sheriff Pownall appear to have been adequate as pretermination hearings, *see Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009); *Powell v. Mikulecky*, 891 F.2d 1454, 1458–59 (10th Cir. 1989) (holding that informal conversation satisfied due process); and he was offered a hearing after his employment had ended, although he failed to attend it.

Accordingly, we affirm the summary judgment for Defendants on Mr. Lauck's due-process constructive-discharge claim.

## C.    First Amendment Claim

Mr. Lauck's final claim is that Defendants retaliated against him for exercising his First Amendment right to free speech.[5] To analyze such a claim on summary judgment, we follow a five-step approach based on *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968). *See Deutsch v. Jordan,* 618 F.3d 1093, 1097–98 (10th Cir. 2010). In the first step the court must "determine whether the employee speaks pursuant to his official

---

[5] The statement of Mr. Lauck's First Amendment claim in his opening brief also alleges a violation of his freedom of association. But he makes no further mention of freedom of association, so we need not address the matter. *See Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992) ("[I]ssues designated for review are lost if they are not actually argued in the party's brief.").

duties. If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Deutsch*, 618 F.3d at 1097 (internal quotation marks omitted). If the speech is not pursuant to official duties, the court proceeds to the second step, which requires it "to determine whether the subject of the speech is a matter of public concern. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends." *Id.* (internal quotation marks omitted). If, however, the speech is on a matter of public concern, the court proceeds to the third step, where it "determine[s] whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Id.* (internal quotation marks omitted). In the fourth step, the court decides whether the employee has shown that "his speech was a substantial factor or a motivating factor in a detrimental employment decision," *id.* at 1097–98 (internal quotation marks omitted); and "if the employee establishes that his speech was such a factor," the court then decides in the fifth step whether "the employer [has] demonstrate[d] that it would have taken the same action against the employee even in the absence of the protected speech," *id.* at 1098 (internal quotation marks omitted). Of course, in a summary-judgment proceeding we view the historical facts in the light most favorable to the nonmovant. *See* Fed. R. Civ. P. 56(c).

In his opening brief on appeal, Mr. Lauck identifies only two statements that allegedly resulted in retaliatory action: an incident report asserting that a fellow deputy had used excessive force and a letter from his attorney about CCSO's failure to prevent a murder. Although he asserts that he "drew CCSO's attention to incidents of racism, misconduct, and issues affecting public health and safety" and "reported racist conduct to his supervisor on multiple occasions," Aplt. Br. at 3, he provides no specifics. Later in his brief he states that "[a] summary of the speech Lauck claims the CCSO infringed upon or retaliated against is found in CCSO's memorandum supporting its motion for summary judgment. (v.1, doc. 45, pp. 18-19)." *Id.* at 23. But "[t]his court is under no obligation to consider arguments not fully set forth in a party's appellate brief, including arguments incorporated by reference to prior pleadings or other materials." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 979 n.14 (10th Cir. 2003). We will therefore address only the two statements mentioned above.

### 1. The Incident Report

The first statement was an official internal incident report submitted by Mr. Lauck in 2002. The report gave his account of his participation in and observations of the apprehension of a suspect who had fled after being stopped for speeding. After a two-hour search, the suspect was found hiding in a steel culvert. A dog was released to force him to come out. Mr. Lauck's opening brief

-15-

characterizes his report as "question[ing] the need to release the dog on a trapped, freezing suspect who was not even wearing a shirt or shoes." Aplt. Br. at 6.

Mr. Lauck's retaliation claim based on this report fails on the first step of the *Garcetti-Pickering* analysis. The report is not protected speech because it was prepared as part of his duties as a deputy sheriff. *See Garcetti,* 547 U.S. at 421. Therefore, the report cannot serve as a basis for his First Amendment retaliation claim.

### 2. Statement to Counsel

The other instance of Mr. Lauck's allegedly protected speech involved an eight-page letter that his lawyer sent to Sheriff Pownall on April 20, 2006. The purpose of the letter was to complain of CCSO's "pattern and practice of denying Deputy Lauck his civil rights and substantive and procedural due process, retaliating against him because he speaks the truth, and seeking a pretext, any pretext, to terminate Deputy Lauck." R., Vol. 1 pt. 3 at 423. Among the incidents recounted in the letter is the murder of a witness after the CCSO had received warnings that the witness had been threatened. The letter asserts that the "CCSO's neglect and wantonness was the proximate cause of that [witness's] death." *Id.* Two weeks after the letter was sent, Mr. Lauck received a written reprimand for violating a confidentiality directive regarding the murder. The reprimand states that Mr. Lauck's discussion of the homicide case with his attorney violated the order not to discuss the case.

-16-

We will assume, without deciding, that the content of the letter was protected speech of Mr. Lauck. We can also assume that Mr. Lauck's claim survives the second and third steps of the *Garcetti-Pickering* analysis (the speech was on a matter of public concern and Mr. Lauck's interest in speaking outweighed the interests of the sheriff's office). The claim fails at the fourth step, however, because of lack of evidence of causation.

Mr. Lauck contends on appeal that "Lauck's counsel's letter upset Pownall and that Pownall 'transferred' Lauck in retaliation and to keep Lauck 'out of the loop' so he could not witness and report further CCSO misconduct." Aplt. Reply Br. at 25. But we agree with the district court that he has failed to produce sufficient evidence to support a finding that his transfer was in retaliation for his disclosure to his attorney or any of the other contents of his attorney's April 20, 2006, letter. The transfer was not ordered until November 15, almost seven months later. We have repeatedly held that one cannot infer causation from temporal proximity alone when the time lapse between the protected activity and the retaliatory act exceeds three months. *See Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (discussing retaliation under Title VII); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (discussing retaliation under the American with Disabilities Act); *Richmond v. Oneok, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997) (discussing retaliation under the Fair Labor Standards

Act). We can see no reason why the causation analysis used in those cases should not apply to a First Amendment retaliation claim.

True, events in the interim might provide sufficient additional support to sustain a causation finding. In our view, however, those events argue against a causal link. Although Mr. Lauck received a reprimand two weeks after his attorney sent the letter, he received a positive performance appraisal in September 2006. His performance ratings ranged from 3 (meaning effective) to 5 (meaning outstanding). He thus qualified for a 3% merit salary increase effective November 5, 2006. The positive performance appraisal is inconsistent with a retaliatory motive.

Moreover, events that reasonably account for the transfer decision began to arise in October 2006, shortly before the transfer. Deputy Marlene Sharpe came to Sergeant Curt Wendelboe to complain that Mr. Lauck had failed to back her up during a traffic stop on October 8, 2006. After Sergeant Wendelboe reviewed a video of the incident, he and Corporal Eric Hyland prepared a memo to Captain Seeman on October 25, expressing the view that Mr. Lauck's actions during the traffic stop demonstrated a lack of concern for other officers. The memo also mentioned earlier incidents in which Mr. Lauck's actions had put others in danger. Captain Seeman then asked for any other examples of conduct by Mr. Lauck that may have endangered fellow officers. A memo to Captain Seeman dated October 30 laid out the other deputies' general impressions of Mr. Lauck

and concluded by stating that "all officer[s] expressed a desire that [Mr. Lauck] be transferred to another job. Morale is certainly low on [Sergeant Wendelboe's] shift when Mr. Lauck is working." R., Vol. 1, pt. 3 at 412. Two weeks later Sheriff Pownall and Captain Seeman made the decision to transfer Mr. Lauck.

On this record the district court properly rejected Mr. Lauck's First Amendment retaliation claim based on his statements to his counsel and his counsel's letter.

## III. CONCLUSION

We AFFIRM the judgment of the district court.