FILED
United States Court of Appeals
Tenth Circuit

April 11, 2011

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

JENNIFER McINERNEY,

        Plaintiff-Appellee/Cross-
        Appellant,

v.

UNITED AIR LINES, INC., a Delaware
corporation,

        Defendant-Appellant/Cross-
        Appellee.

No. 09-1423 & 09-1425
(D.C. No. 1:07-CV-00724-RPM)
(D. Colo.)

ORDER AND JUDGMENT[*]

Before **BRISCOE,** Chief Judge, **McKAY** and **HARTZ**, Circuit Judges.

Jennifer McInerney brought suit against her former employer, United Air Lines,

Inc. (United), alleging that United discriminated and retaliated against her in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), by

denying her an unpaid leave of absence and subsequently terminating her employment. A

jury found in McInerney's favor on her retaliation claim. The jury awarded $3,000,000 in

compensatory damages, which was reduced to the statutory maximum of $300,000, and

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the district court awarded $89,877 in back pay. Both parties appealed. United appeals the district court's denial of its renewed motion for judgment as a matter of law, the district court's rejection of some of its requested jury instructions, and the district court's denial of its motion for a new trial based on excessive damages. McInerney appeals the district court's refusal to submit the issue of punitive damages to the jury and the district court's denial of front pay. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm and remand only for determination of reasonable attorney fees for McInerney's defense of United's appeal.

I

McInerney began her employment with United in December 1994, working in sales and reservations at the Denver International Airport (DIA). She later worked as a customer service representative and, by January 2000, had become a customer service supervisor. McInerney became a ramp supervisor in 2002, managing the operation of several gates within DIA's Concourse B. Working on the ramp was a physically demanding job that involved supervision of the loading and unloading, fueling, and de-icing of aircraft at ten to twelve gates. JA at 1485-88. The chain of command within the ramp department was as follows: ramp servicemen reported to ramp supervisors, who reported to ramp operating managers, who, in turn, reported to the ramp manager.

Kevin Mortimer became United's DIA ramp manager in April 2005. Mortimer "watched over all of his department," which was the entire ramp department at DIA, and was a "very hands on" manager. Id. at 1857. McInerney and other former United

2

employees testified that Mortimer treated male employees better than female employees, that he raised his voice when speaking with, and was generally dismissive of, female employees. He was heard on two occasions to remark that women belonged at "home, barefoot and pregnant." Id. at 1780, 2053 ("Women belonged at home, pregnant, barefoot, and in the kitchen."). McInerney testified that, in spite of her consistently positive performance evaluations, Mortimer "scream[ed]" at her about her "dependability" during a meeting in May 2005. She testified that he "really just kind of went off from the second I walked in the office." Id. at 1497.

McInerney became pregnant with her first child in May 2005. She began having health problems in June 2005, due in part to the hot temperatures in Denver. Her doctor discouraged her from working on the ramp, and she began looking for desk positions within United. She unsuccessfully applied for a scheduling supervisor position, and testified that she later learned that Mortimer "specifically told [the department supervisor] that I could not interview for that position" because "[Mortimer] was not able to lose [her] from the ramp at [that] time." Id. at 1538. However, McInerney also learned that another male ramp supervisor, Tim Hushion, received the scheduling supervisor position. Id. at 1532. She also unsuccessfully applied for an opening in the Wellness Department, and heard that Mortimer had placed a male ramp supervisor, Greg Banton, in the position in September 2005. Id. at 1548.

By July 2005, McInerney had been moved to Concourse A, a less demanding ramp assignment with fewer gates to manage. Her health began to deteriorate, and she took

3

"intermittent days off here and there." Id. at 1518. On September 28, 2005, McInerney had a "really bad dizzy spell" and a United doctor told her "there is no way that you should be working on the ramp in the condition that you are in." Id. at 1519. The same day, McInerney's doctors diagnosed her with preeclampsia and placed her on bed rest. Her health further deteriorated in late October, and she was admitted to the hospital in early November. Days later, with kidney and liver failure and fluid in her lungs, doctors performed "an emergency C-section at 28 weeks" and delivered her son, Cooper, on November 11, 2005. Id. at 1520.

Cooper weighed one pound, fifteen ounces and suffered from severe medical problems: his heart would frequently stop beating, he could not digest food, he suffered from apnea because of his weak lungs, and "there [were] a lot of questions of cerebral palsy because of the central nervous system being so compromised." Id. at 1520, 1522-24. Two days after McInerney was released from the hospital, her cesarian section split open and she had to return to the hospital and then receive home health care. Cooper was released from the hospital in late January 2006, and McInerney "lived in [a] bubble with Cooper" at home, constantly monitoring his condition and working with a therapist on a daily basis. Id. at 1524.

Cooper's doctors informed McInerney that "[she had] a huge road ahead of [her], and this is going to be a tough fight, and [she's] going to need to be the person taking care of [Cooper]." Id. McInerney had been on Family and Medical Leave Act (FMLA) leave beginning in September 2005, and that leave was scheduled to expire on February 19,

4

2006.  Id. at 2579.  In December 2005, McInerney began to inquire about her options for a more extended, and unpaid, leave of absence from United.

McInerney contacted ramp operating manager Rhonda Patterson-Eachus (Patterson) in the first week of December, "told her the situation was pretty grim," and asked about her options for obtaining an extended leave.  Id. at 1531-32.  McInerney testified that Patterson "didn't really think that it was going to be a problem for me to get a leave of absence" and that Patterson said she would talk to Mortimer about it.  Id. at 1532.  Patterson told McInerney to give her a couple of weeks to see about the leave of absence, and in the meantime, scheduled McInerney's accrued vacation time in order to extend her time off until March 20, 2006.  Id. at 1533, 2579.

On December 28, 2005, after leaving a few messages with Patterson and not receiving a response, McInerney called Jeanne Nelli, a United Human Resources Generalist in Chicago, and explained her request for an unpaid leave of absence.  According to McInerney, she also made a discrimination complaint at this time, explaining how she had applied for several jobs off the ramp and "felt that [she] was being frozen out because [she] was a female and [she] was pregnant."  Id. at 1534.  Nelli testified that McInerney did not make a discrimination complaint during this discussion, and that she first learned of McInerney's discrimination complaint in an e-mail from Patterson in late February 2006.  McInerney testified that Nelli said the leave of absence "should be no problem."  Id. at 1559.

McInerney called Nelli several times in January and February 2006 but received

5

no response regarding her leave of absence. Patterson called McInerney on February 23, 2006 and told her that Mortimer had denied the leave of absence based on "operational need, they didn't have enough supervisors." Id. at 1566. During this conversation, McInerney complained to Patterson about discrimination stating, "this is discrimination. I'm not being given this because I'm a woman on the ramp, and I just had a disabled child." Id. at 1567. McInerney testified that Patterson "basically said I agree with you" and "agreed to call Jeanne Nelli, to go over Kevin Mortimer's head and see if there was something that her and Jeanne Nelli could do." Id. Two days later, Patterson called back and told McInerney there was nothing she (Patterson) could do. On February 28, 2006, Nelli telephoned McInerney and informed her "that she supported Kevin Mortimer's decision." Id. at 1586.

Nelli and McInerney exchanged e-mails throughout March 2006 concerning a meeting to discuss McInerney's discrimination complaint. McInerney wanted to have a lawyer or an independent witness present, or to tape record the meeting. Nelli refused because those options were against company policy, but suggested that a member of United management be present. McInerney refused that option. In the interim, McInerney's complaint was not investigated.

McInerney sent an e-mail to Mortimer on March 6, 2006 "express[ing] [her] deep concern that United . . . has never investigated [her] claims that [she has] been the victim of sex discrimination." Id. at 2473. Mortimer did not respond. McInerney also sent him an e-mail on March 19, 2006, attaching a letter from Cooper's doctor explaining that "[i]t

6

will be necessary for Mrs. McInerney to remain at home to care for her special needs infant, Cooper, until at least 01 December 2006." Id. at 2512. Mortimer did not respond to this e-mail, but forwarded it to Nelli with the annotation "Latest and greatest from Jennifer." Id. at 2511-12.

McInerney's combined FMLA leave and vacation was scheduled to expire on March 20, 2006. She was allowed to extend her absence for a few days by taking personal holidays. On March 23, 2006, Nelli sent McInerney an e-mail informing her of a return date of March 25, 2006, but also suggesting another option:

> Due to the shortage of staffing for [ramp] Supervisors, as discussed we cannot provide a [leave of absence] for you. You can, however, exercise your seniority and return to the position of a Customer Service Representative. A non-management job does provide more flexibility and we would be able to grant you a [leave of absence]. Based on the contract . . . you would be granted a Leave for 90 days, a leave can be extended upon an appropriate application in writing, but it is not guaranteed.

Id. at 2589. McInerney contacted Pam Brown, a scheduling supervisor, who informed McInerney that customer service was "so short staffed, there is no way [customer service] could give you a leave." Id. at 1593-94. McInerney decided that "there was no way I could take this demotion. I was going to take a 40 percent pay cut, and go back to work and lose right away, and lose everything." Id. at 1594.

McInerney did not return to work on March 25. On March 29, 2006, Nelli sent McInerney an e-mail informing her that she was expected to return to work (either on the ramp or as a customer service representative) on March 31, and if she failed to do so, United "will consider you to have voluntarily resigned your employment . . . ." Id. at

7

2493. McInerney was designated as "ANP," or "authorized no pay," between March 25 and March 31, 2006. Nelli testified that a person "who is not showing up to work" would be designated "UNP," or "unauthorized no pay." Id. at 2252. On March 31, 2006, McInerney did not return to work and Nelli deemed her to have resigned as of that date. Nelli also designated McInerney as "not eligible for rehire" for failure to give two weeks' notice. Id. at 2254. United opposed McInerney's claim for unemployment benefits, arguing that McInerney was ineligible because she resigned. Id. at 1606-07.

Patterson, Mortimer, and Nelli offered their own versions of events. In December 2005, Patterson thought that the ramp department could afford to grant McInerney a leave of absence because the department had plenty of supervisors. Patterson testified that Mortimer's initial response to her inquiry was, simply, "no." Id. at 1831. In February 2006, Patterson determined that "we [the ramp department] could not afford for her to be gone any longer" because there was a difference between covering McInerney's position while she was on leave and filling her position with a replacement. Id. at 1835, 1870.

Mortimer testified that, when Patterson approached him in December, he said "we would look at it," and discussed the ramp department's "ability to absorb a body out of the department given [its] current conditions." Id. at 2155. When Mortimer made the final decision to deny the leave of absence in late February 2006, he "knew at that point that there were options available to Jennifer that would have allowed her time away from work . . . but not under the [ramp] organization." Id. at 2170. Mortimer testified that he could not give McInerney a leave of absence because it was his understanding that he had

8

to keep the position open for her until she returned and, thus, could not fill the position while she was out. However, Mortimer admitted on cross-examination that this was his personal interpretation of United's leave policy. Id. at 2161. The policy itself states that a return from a leave of absence greater than ninety days is contingent upon available job openings, which would mean that Mortimer was not required to hold McInerney's position open following a leave of absence greater than ninety days. Id. at 2162.

The jury found in United's favor on McInerney's discrimination claim and in McInerney's favor on her retaliation claim and awarded her $3,000,000 in compensatory damages. The district court reduced the damage award to the statutory limit of $300,000 and awarded McInerney $89,777 in back pay, but denied McInerney's request for front pay.

United filed a renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), and a motion for a new trial under Fed. R. Civ. P. 50 and 59 on the ground that the jury's award of damages was so excessive that it could only have been the result of passion, prejudice, or other improper cause. The district court denied both motions. Both parties have appealed.

II

*Denial of United's Rule 50(b) Motion*

United argues that McInerney failed to present evidence that United terminated her (United contends she resigned), or that a causal connection existed between her discrimination complaint and her discharge. Given the highly deferential standard

9

applicable to our review of jury verdicts, we conclude that there was sufficient evidence from which the jury could find that United terminated McInerney's employment, and from which the jury could infer that United did so in retaliation for McInerney's discrimination complaint. Therefore, we affirm the district court's denial of United's Rule 50(b) motion.

### A. *Standard of Review*

We review de novo the denial of a motion for judgment as a matter of law, applying the same legal standard as the district court. Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d 1260, 1269 (10th Cir. 2008). Judgment as a matter of law is appropriate only if there is no legally sufficient evidentiary basis from which a jury could reasonably find for the nonmoving party. Fed. R. Civ. P. 50(a)(1). In our review, we "review all the evidence in the record, construe the evidence and inferences most favorably to the nonmoving party, and refrain from making credibility determinations and weighing evidence." Tyler v. RE/MAX Mountain States, Inc., 232 F.3d 808, 812 (10th Cir. 2000). We must "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).

### B. *Discussion*

Title VII prohibits an employer from retaliating against an employee for making a claim of gender discrimination. See 42 U.S.C. § 2000e-3(a). To prevail on a Title VII retaliation claim, a plaintiff must show "that retaliation played a part in the employment

10

decision . . . ." Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224 (10th Cir. 2008). In order to make a prima facie case of retaliation, a plaintiff must show: 1) that he or she engaged in protected activity; 2) that he or she was subject to an adverse employment action; and 3) "that a causal connection exists between the protected activity and the materially adverse action." E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 803 (10th Cir. 2007). If the employer, as United did here, proffers a legitimate, non-retaliatory explanation for the adverse action, the plaintiff must demonstrate that this reason is pretextual. Id. at 804-05. "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons."[1] Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted). United concedes that McInerney engaged in protected activity, but United argues she did not establish that she was subject to an adverse employment action or that there was a causal connection between the protected activity and the adverse action. To prevail on appeal, United must show that no reasonable person could find 1) that it terminated McInerney's employment, or 2) that there was a retaliatory motive behind its decision to terminate McInerney. See O'Neal v. Ferguson Constr. Co., 237

---

[1] We have stated that, "[i]n analyzing the sufficiency of the evidence post-trial, 'the burden-shifting framework of McDonnell Douglas[ v. Green, 411 U.S. 792 (1973),] is largely irrelevant.'" Hysten, 530 F.3d at 1270 (quoting Stewart v. Adolph Coors Co., 217 F.3d 1285, 1288 (10th Cir. 2000)). While the burden-shifting framework is largely irrelevant after a jury trial, the substantive elements of the test remain relevant.

11

F.3d 1248, 1252 (10th Cir. 2001).

### i. Adverse Employment Action/Termination

United argues that McInerney presented no evidence that United terminated her employment, and contends that she voluntarily resigned. United's voluntary resignation argument misses the mark and speaks more to United's <u>reason</u> (her failure to return to work) for ending McInerney's employment, rather than whether United ended it.

We must note that, from the outset of this case, the district court determined that this was a straightforward termination case. It did not instruct the jury regarding constructive discharge or non-termination adverse employment actions.[2] Thus, we assume that United's denial of McInerney's requested leave of absence was not, itself, an adverse employment action.[3] Nonetheless, we conclude that there was sufficient evidence from which the jury could find that McInerney suffered an adverse employment action because United terminated her employment.

Termination of employment is "clearly an adverse employment action." <u>Fye</u>, 516 F.3d at 1228. Throughout the trial, United contended that it did not terminate McInerney, but rather that she voluntarily resigned by failing to return to work on March 31, 2006. There is no evidence that McInerney told her employer that she was resigning. The

---

[2] We address the jury instructions in Part III, <u>infra</u>.

[3] This is not to say that the denials of leave are irrelevant. The jury could consider them as evidence of retaliation, and could consider them to the extent that they factored into Nelli's assessment of McInerney's situation and Nelli's ultimate decision. The same is true for United's designation of McInerney as not eligible for rehire.

12

evidence showed that McInerney did not intend to resign, and that she desperately wanted to keep working at United. Cf., e.g., Strickland v. United Parcel Svc., Inc., 555 F.3d 1224, 1227-29 (10th Cir. 2009) (determining whether employee intended to end her employment was a jury question where employee turned in her company laptop and informed her supervisor she was leaving, but testified that she did not believe she had quit or resigned at that time). This is not a case where an employee simply abandoned her position without any notice to or communication with her employer. Rather, there was ample testimony at trial that, after initially extending her return date, Nelli decided to end McInerney's employment by "deeming" that McInerney had resigned.

A jury could reasonably find that United terminated McInerney. In Wells v. Colorado Department of Transportation, 325 F.3d 1205 (10th Cir. 2003), the employer claimed "he had no choice but to terminate Plaintiff because he had never received notice that [plaintiff] was able to return to work" after the expiration of her medical leave. Id. at 1212. We stated that the termination was an adverse employment action because "[i]t hardly requires stating that when an employer tells an employee that she no longer has a job, that employee's job status has been significantly and materially altered." Id. at 1216.[4] We determined that there was an adverse employment action by the employer,

[4] Each of the three district court cases that United relies heavily upon in its brief supports our conclusion. In each of these cases the plaintiff's employment was terminated after the plaintiff failed to return to work upon the expiration of FMLA leave. In each case, the district court determined that the termination was an adverse employment action. See Johnson v. Cmty. Coll. of Allegheny Cnty., 566 F. Supp. 2d 405, 425, 432 (W.D. Pa. 2008) (finding that the plaintiff suffered an adverse employment
(continued...)

13

even though the termination was the natural consequence of the employee's choice not to return to work. If, for example, an employer informed an employee that it would consider her late arrival at work to be a voluntary resignation, a jury could still reasonably find that the employer took an adverse employment action if it subsequently terminated her employment for tardiness. Cf. Roberts v. Park Nicollet Health Svcs., 528 F.3d 1123 (8th Cir. 2000) (assuming, without discussing, that an employee suffered an adverse employment action under similar circumstances). The same is true in this case. Whether or not it was a consequence of McInerney's failure to return to work, a jury could reasonably find that United took the action that ended McInerney's employment tenure by terminating her when it "deemed" she had resigned.

McInerney did not report to work on her scheduled return date of March 25, 2006. However, McInerney's failure to report to work on March 25 was not "deemed" a

---

[4](...continued)
action when her employment was "brought to a closure" because she had not reported to work); Mitchell v. The Geo Gp., Inc., No. 05-cv-00197-PSF-CBS, 2006 WL 2711757, at *1 (D. Colo. Sept. 21, 2006) ("It is undisputed that plaintiff was terminated on or about May 20, 2003 when she did not return to work following an authorized leave of absence pursuant to her FMLA request, thus she was subject to an adverse employment action."); Sweis v. Hyatt Corp., No. 98 C 7770, 2001 WL 619509, at *4 (N.D. Ill. May 25, 2001) ("Sweis suffered an adverse action by the employer when she was terminated from her position [after failing to return to work] with the Hyatt Corporation on July 27, 1995."). The plaintiffs in these cases did not ultimately prevail because they could not rebut the employers' proffered non-discriminatory reasons for the adverse employment actions: their return-to-work policies. United's argument on this point speaks to whether McInerney can show pretext, and not whether she has made a showing of an adverse employment action. Cf. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 & n.3 (10th Cir. 2006) (analyzing whether the employer's explanation that the plaintiff was terminated due to "job abandonment" was a pretext for discrimination, and not considering whether the termination was an adverse employment action).

14

resignation, and her employment did not end on that date. When asked, "did you at that point [on March 25] deem that she had resigned?" Nelli replied, "I kn[e]w she still wasn't coming back to work. Based on our e-mails, <u>I hadn't quite deemed it that she had resigned at that point</u>. I think I had sent her another e-mail after this point." <u>Id.</u> at 2218-20 (emphasis added). On March 29, 2006, Nelli sent McInerney another e-mail stating: "[y]ou are expected to return to work within 2 days, March 31st, to your current position as a Supervisor in [the ramp] or as a Customer Service Representative, with the option of a 90 day LOA. If you do not return to either position within 2 days, we will consider you to have voluntarily resigned your employment at United Airlines. Please notify me of your decision." <u>Id.</u> at 2493. When McInerney did not appear at work on March 31, 2006, Nelli determined that McInerney "had chosen not to come back to work" and deemed that McInerney resigned as of that date. <u>Id.</u> at 2223. McInerney's employment with United ended when Nelli made that decision.[5]

---

[5] This evidence reveals the fallacy of the dissent's statement that Nelli did not have authority to extend McInerney's leave and, by the same token, control the date of her termination. The broader question posed by the dissent, <u>i.e.</u>, whether Nelli had the authority to grant McInerney "the lengthy leave of absence she desired" was not the focus of the evidence presented by either party. Dissent at 3. Rather, the parties' arguments focused on whether McInerney was terminated, or whether she voluntarily resigned. Regardless of whether Nelli could have granted a leave of absence going forward, this evidence permits the inference that Nelli made the decision to terminate McInerney's employment by declining to further extend her return date and deeming her to have resigned.

The narrow issue presented here is whether McInerney presented enough evidence to satisfy the second element of her retaliation case: that she suffered an adverse employment action. The dissent suggests that our decision "imposes liability on United simply because it allowed Nelli a little wiggle room in enforcing company policy." <u>Id.</u> at

(continued...)

15

A jury could reasonably find that Nelli had the discretion to extend McInerney's return date, even after McInerney failed to report to work on March 25, 2006. A jury could reasonably find that, on March 31, Nelli decided not to further extend McInerney's return date and, instead, decided to end McInerney's employment. Given this evidence, a jury could reasonably find that Nelli terminated McInerney's employment on March 31, 2006.

### ii. Retaliation

United also argues that there was insufficient evidence from which a jury could infer that it terminated McInerney's employment in retaliation for her discrimination complaint. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully" retaliated. Reeves, 530 U.S. at 148.

"A causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive . . . ." MacKenzie v. City and Cnty. of Denver, 414 F.3d 1266, 1279 (10th Cir. 2005) (internal quotation omitted).

---

[5](...continued)
4. Not so. This "wiggle room," and Nelli's ultimate decision are evidence from which the jury could find that United took an adverse employment action. That adverse action, by itself, is not sufficient to impose liability. Rather, the jury had to further find that the adverse action was taken for an improper reason.

Clearly, there is a plausible benign explanation for Nelli's action: United's return-to-work policy. However, we are bound by the scope of review in this case. As explained infra, there was sufficient evidence from which the jury could find that this explanation was pretextual, and that the real reason United terminated Nelli's employment was retaliatory.

"[P]rotected conduct followed closely by adverse action may justify an inference of retaliatory motive." Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996).

Nelli testified that she learned of McInerney's discrimination complaint in late February 2006. According to McInerney, this complaint was never investigated, and by March 31, 2006, all remaining leave options were rejected and she was terminated. The timing of these events could reasonably give rise to an inference of a retaliatory motive. Nelli admitted that she did not pursue any investigation other than attempting to speak with McInerney. JA at 2241. For example, she did not question Mortimer. Id. Nelli also admitted that she was "wearing two hats," in that she terminated McInerney at the same time she was supposed to be investigating McInerney's complaint. Id. at 2259. She acknowledged that her obligation to investigate the discrimination ended once McInerney was terminated. Id. The lack of investigation is consistent with testimony by Dara Dalvit, another female former United ramp supervisor. Dalvit testified that United never acted on her own complaints of gender discrimination by Mortimer.[6] Id. at 2074.

Further, the jury could reasonably infer retaliation from Nelli's decision to designate McInerney as ineligible for rehire based on her purported failure to give two weeks' notice. McInerney was "ANP" from March 25 through March 31, 2006, which

---

[6] United does not appeal the admission of Dalvit's testimony at trial. Therefore, our statement that "anecdotal evidence of discrimination should only be admitted if the prior incidences of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand," is not relevant here. Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000) (internal quotation omitted). Dalvit's testimony was before the jury.

17

means that United authorized her absence during that period.[7] Further, Nelli had discussed McInerney's leave of absence or return to work prior to March 25. Nonetheless, Nelli determined that McInerney failed to give two weeks' notice as of March 31. A jury could reasonably find Nelli's explanation for designating McInerney as ineligible for rehire disingenuous because Nelli was aware of McInerney's situation for many weeks prior to March 31, and it was Nelli who unilaterally determined the date on which McInerney's employment ended, which was the date from which any two weeks' notice would have been measured. Further, the two weeks' notice requirement would only be triggered if McInerney had in fact resigned.

United argues that McInerney's employment was terminated for a legitimate non-retaliatory reason: its policy that employees who did not return to work would be deemed to have resigned. See United Opening Br. at 33 ("[W]hen an employee's separation is the result of the employer's consistent application of its policies—in this case treating a failure to return to work after the expiration of authorized leave as a resignation—it cannot constitute retaliation."). It is true that an employer's application of a general policy to an employee is not retaliation. See Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1229 (10th Cir. 2006). However, there was evidence from which the jury could reasonably find that United's explanation was pretextual because the return-to-work policy was not generally applied and was not even consistently applied by Nelli to

_____

[7] Nelli testified that she had the power to determine whether McInerney was designated "ANP" (authorized no pay) or "UNP" (unauthorized no pay). JA at 2251-52.

18

McInerney.[8]

McInerney was scheduled to return to work on March 25, 2006. However, when McInerney failed to return to work, Nelli "hadn't quite deemed that [McInerney] had resigned at that point." JA at 2219. On March 29, 2006, Nelli sent McInerney an e-mail offering her the customer service position and informing her that she was expected to return to work on March 31, 2006. Id. at 2493. When asked at trial, "Why did you wait five days after she was supposed to return to work to reach out to her again?" Nelli replied:

> She still hadn't returned back to work. I knew she had missed again four days. I was thinking that maybe the next day we'd hear from her or something. So, I extended it again. And, I sent her an e-mail and just said, okay, this was kind of the last ditch effort. Let's see if she'll come to work, call me, have some type of conversation as far as if she was going to return or not. So, I extended it until the 31st.

Id. at 2219 (emphases added). Nelli continued, "I thought maybe I would just give her a little bit more time and we would just say, okay, here it is. This is the last chance. This is as far as I could go with it. Maybe you still want to reconsider. So yeah, I gave her one more opportunity." Id. at 2220. McInerney also testified that a ramp supervisor named Marcus "didn't show up to work for six weeks, and nothing was done to him for two

---

[8] United's contention that "the undisputed evidence was that . . . no employee who failed to return to work from FMLA or other leave was allowed to maintain their employment with United," United Opening Br. at 41, mischaracterizes the record. The only evidence presented regarding other employees' failure to return to work was McInerney's undisputed testimony that "nothing was done" to a ramp supervisor named Marcus for two months after he failed to return to work. JA at 1692; see also n.8, infra.

months."[9] Id. at 1692. From this evidence, a jury could reasonably find that United did not have a consistent policy of treating a failure to return to work as a resignation.

On March 30, 2006, McInerney telephoned Nelli to inform her that she could not come to work on March 31 because Cooper was having surgery that day. McInerney did not return to work on March 31, 2006. When asked, "Why didn't you just go ahead and extend the [return] date further?" Nelli replied, "I had extended it already. I mean, at this point it was clear that she was not going to be returning to work. She had chosen not to come back to work." Id. at 2223. Nelli ended McInerney's employment on March 31, 2006.

Nelli was the United employee charged with the responsibility of investigating McInerney's discrimination complaint, and she was also the person who decided to terminate McInerney's employment before that complaint was investigated. Further, Nelli made this decision with the knowledge that McInerney's discrimination complaint was intertwined with whether United would make further allowances to permit her continued employment with United. Even with this knowledge, and after having been in protracted discussions with McInerney about her ability to return and granting extensions to that return date, Nelli "deemed" McInerney to have resigned without two weeks' notice. Mindful of our standard of review, which requires us to construe the evidence and

---

[9] McInerney's testimony about Marcus was elicited on cross-examination by United's counsel. Counsel did not question McInerney further about Marcus. Although this testimony was not corroborated, it also was not challenged. Neither party mentions this testimony in its briefs on appeal. However, in reviewing the denial of a motion for judgment as a matter of law, we review the entire record. Tyler, 232 F.3d at 812.

20

make all inferences in McInerney's favor, <u>Tyler</u>, 232 F.3d at 812, we conclude that there was sufficient evidence from which the jury could find that United terminated McInerney's employment in retaliation for her discrimination complaint. Therefore, we affirm the district court's denial of United's Fed. R. Civ. P. 50(b) motion.

III

*Jury Instructions*

A. *Standard of Review*

We review the jury instructions de novo to determine if, as a whole, the jury instructions accurately informed the jury of the governing law. <u>Zokari v. Gates</u>, 561 F.3d 1076, 1090 (10th Cir. 2009). In contrast, we review the district court's decision to deny a request for a particular jury instruction for an abuse of discretion. <u>Id.</u> In this regard, we have stated that

> a party is not entitled to a specific jury instruction on every correct proposition of law. When the other instructions establish a sound basis for an argument by the party to the jury on that proposition, an additional instruction is not essential and runs the risk of suggesting that the trial judge has adopted the party's view.

<u>Hertz v. Luzenac Am., Inc.</u>, 370 F.3d 1014, 1023 (10th Cir. 2004). If we conclude that the district court erred in instructing the jury, we must reverse only if the instructional error was prejudicial in light of the whole record. <u>Smith v. Diffee Ford-Lincoln-Mercury, Inc.</u>, 298 F.3d 955, 962 (10th Cir. 2002).

B. *Discussion*

United contends that the jury instructions "were premised on the notion that United

21

had fired/terminated McInerney," and, therefore, the district court's refusal to give its requested Instruction Nos. 9, 16-18, and 26 constituted error. United Opening Br. at 50. United emphasized its voluntary resignation argument throughout trial and during closing argument. E.g., JA at 2298 ("The first key question, did United terminate Ms. McInerney's employment? Did it fire her? That's what you as the jurors have to determine. Was there even a termination?"); 2301 ("[Y]ou cannot hold United Air Lines liable when somebody makes a choice not to come back to work."). However, as explained in Part II, supra, there was significant evidence that it was United and not McInerney, who took the action that ended McInerney's employment.

The jury instructions, as a whole, accurately informed the jury of the governing law. The jury was asked to decide whether United terminated McInerney. If it concluded that United did not end McInerney's employment, it necessarily had to conclude that McInerney had resigned. The district court instructed the jury that it had to find "that the plaintiff suffered an adverse employment action resulting [sic] termination of her employment," that "the plaintiff's opposition to discrimination was a determining factor in the termination of her employment at United Air Lines," id. at 2608, and that McInerney must prove that "retaliation for her complaints made a difference in the actions in the sense that but for . . . retaliation, she would not have been treated in the same way and then terminated from her employment," id. at 2610. Further, the verdict form required the jury to find "by a preponderance of the evidence that the defendant United Air Lines retaliated against her because of her complaints of sex discrimination in

22

terminating her employment." Id. at 1241. Although they are not a model of completeness or clarity,[10] these instructions are sufficient to inform the jury of the governing law. If the jury believed that McInerney had voluntarily resigned, it could not have found that "but for . . . retaliation [McInerney] . . . would not have been . . . terminated from her employment" or that "United Air Lines retaliated against her . . . in terminating her employment."

United's requested Instruction No. 9[11] is basically a reiteration of United's argument that it did not terminate McInerney's employment because she resigned, and it was not an abuse of discretion for the district court to reject it. The same is true of requested Instruction No. 26.[12] As discussed in Part II, supra, the adverse employment

---

[10] We do have concerns with the jury instructions. The retaliation instructions focused more heavily on the denial of the leave of absence, rather than the end of McInerney's employment. For example, the instructions discuss United's proffered non-discriminatory reason for denying the requested leave, but not for deeming McInerney to have resigned. However, when the instructions are read as a whole, we cannot conclude the failure to give the instructions United requested was reversible error.

[11] Instruction 9 does not appear in the record on appeal, but is quoted in United's opening brief. See United's Opening Br. at 51. It states: "United denies it terminated McInerney's employment. Rather, United notified McInerney that if she did not return to work, United would construe her failure to return . . . as a voluntary resignation. Accordingly, it was McInerney's voluntary decision to resign and not to return to her position . . . ." Id.

[12] Instruction No. 26 states:

United contends that the separation of McInerney and United was based on a legitimate non-retaliatory reason: McInerney failed to return to work after her leave was exhausted.

(continued...)

23

action itself and the reason for the adverse employment action are distinct. United's argument that it notified McInerney that failure to return to work would be construed as a voluntary resignation would not preclude a jury from reasonably finding that United terminated McInerney's employment. An employer cannot avoid a finding of an adverse employment action by unilaterally declaring that certain employee actions will be deemed a resignation. Cf. Wells, 325 F.3d at 1212 (holding that the employer took an adverse employment action even though he "had no choice" but to do so, and separately analyzing whether the employer had a legitimate, non-discriminatory reason for taking the adverse employment action).

Requested Instruction No. 18[13] appears to be a list of factors to be considered in

---

[12](...continued)
> If you find that United has proved by a preponderance of the evidence that it had a legitimate non-retaliatory reason for the separation of McInerney and United, your verdict must be for United.

JA at 1219.

[13] Instruction No. 18 states:

> An employee is not discharged, and her employment is not terminated, if she voluntarily resigns. Factors to consider in determining whether an employee's resignation was voluntary are:
>
> 1. Whether the employee was given some alternative to resignation;
>
> 2. Whether the employee understood the nature of the choice she was given;
>
> 3. Whether the employee was given a reasonable time in which to choose; and

(continued...)

differentiating between a voluntary resignation and a constructive discharge. Compare

JA at 1221 with Potts v. Davis Cnty., 551 F.3d 1188, 1194 (10th Cir. 2009). Because

McInerney did not advance a constructive discharge theory,[14] it was not an abuse of

discretion to reject Instruction No. 18.

Requested Instruction No. 16 defines termination, and states that an employee is

not terminated if she chooses to resign rather than work under undesirable conditions.[15]

JA at 1219. This instruction was not necessary because the district court's instructions

included termination as an element of McInerney's case. As discussed supra, the jury

could not, consistent with the instructions, have found in McInerney's favor if it believed

she resigned. Requested Instruction No. 17 states that the termination inquiry is

---

[13](...continued)
4. Whether she was permitted to select the effective date of resignation.

JA at 1221.

[14] Constructive discharge is an issue where the plaintiff resigns, but argues that untenable working conditions forced her to do so. Here, the relevant issue was whether McInerney resigned or was terminated — not the reason she did not return to work.

[15] Instruction No. 16 states:
An employee is discharged, or her employment is terminated, when the employer uses language or engages in conduct that would logically lead a prudent person to believe her employment has been terminated. A discharge or termination does not occur, however, when an employee chooses to resign rather than work under what she perceives to be undesirable conditions.

JA at 1219.

objective.[16]  Id. at 1220.  To the extent that Instruction Nos. 16 and 17 emphasize that an employee is discharged if a reasonable employee would believe her employment has been terminated, such instructions are unnecessary because United's final decision and notification of McInerney were not ambiguous.  Cf. Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1202 (10th Cir. 2008) ("Sprint does not, and could not, contest the . . . question whether a reasonable employee would find the termination of his or her employment to be materially adverse.").

United also appeals the district court's denial of its requested Instruction No. 15 defining similarly situated employees.  United cannot show that the failure to give this instruction was prejudicial because the jury's verdict can be sustained without reliance on any of the testimony regarding other employees who were or were not granted personal leaves of absence.  In the same vein, United's argument regarding the district court's refusal to give a "business judgment rule" instruction relates to the reasons the leave of absence was denied, and not to the decision to terminate McInerney's employment.  See United Opening Br. at 54-55.  Because the jury's verdict can be sustained without reliance on the denials of leave, the failure to give this instruction was not prejudicial.  When read as a whole, the jury instructions accurately informed the jury of the governing law.  The district court did not abuse its discretion in denying United's request for

_____

[16]  Instruction No. 17 states: "In determining whether a discharge or termination has occurred, the test is an objective one – whether a reasonable person would believe from the employer's language or conduct that the employee's tenure has been terminated. The employee's subjective belief is not relevant."  JA at 1220.

requested Instruction Nos. 9, 16-18 and 26.

IV

*Excessive Damages*

*A. Standard of Review*

We review the district court's denial of a motion for a new trial on the grounds of

excessive damages for an abuse of discretion. Fitzgerald v. Mountain States Tel. & Tel.

Co., 68 F.3d 1257, 1261 (10th Cir. 1995). "[A]bsent an award so excessive as to shock

the judicial conscience and to raise an irresistible inference that passion, prejudice,

corruption or other improper cause invaded the trial, the jury's determination of the

damages is considered inviolate." Malandris v. Merrill Lynch, Pierce, Fenner & Smith

Inc., 703 F.2d 1152, 1168 (10th Cir. 1981) (en banc).

*B. Discussion*

United contends that it is entitled to a new trial because the jury's emotional

distress award was excessive. The jury awarded McInerney $3,000,000 in compensatory

damages on her retaliation claim, which the district court reduced to the statutory

maximum of $300,000. See 42 U.S.C. § 1981a(b)(3)(D). United argues that, pursuant to

Wulf v. City of Wichita, 883 F.2d 842, 874-75 (10th Cir. 1989), we must compare the

amount of damages awarded in this case to damage awards in similar cases to determine

if the award is excessive. In Wulf, we determined that an emotional distress award was

excessive based on review of the record "informed by a review of awards granted in other

comparable cases[.]" Id. at 875. However, we also stated that "comparisons with other

27

cases are not dispositive[.]" Id. In cases decided after Wulf, we have analyzed the propriety of emotional distress awards without referencing other comparable jury verdicts. See, e.g., Smith v. Nw. Fin. Acceptance, Inc., 129 F.3d 1408, 1416-17 (10th Cir. 1997) (considering the nature of the remarks made to the plaintiff, the nature of the harm suffered by the plaintiff, and the context of the discriminatory behavior); Malloy v. Monahan, 73 F.3d 1012, 1017 (10th Cir. 1996) (determining that "the award was adequately grounded in the evidence"); Fitzgerald, 68 F.3d at 1265-66 (determining that damages awards were excessive based on a review of the record). We are not persuaded by United's comparisons to other jury awards. We focus instead on "whether the compensatory award was excessive in relation to the injury[.]" Malandris, 703 F.2d at 1169.

McInerney testified that she was "devastated" and "humiliated" by her termination, JA at 1817, and that she "couldn't stop crying, and for weeks on end, [] didn't really sleep, and it just, it was devastating and humiliating. And, it was horrible." Id. at 1819. Her eleven-year career with United was "part of [her] identity," and now "any time [she] want[s] to do anything to start a new career, [she has] to put on this piece of paper that [she] was fired." Id. at 1818-19. She also testified that the termination "put [her] over the edge" regarding the stress she was already experiencing due to her son's condition. Id. at 1817. She was "so stressed out because [she] didn't know what we were going to do financially. . . . [Her family] had a very expensive baby. [She] lost [her] insurance, and it was so stressful and so emotional, and it's impacted [her] to this day."

28

Id. at 1817-18. Even though she was not "clinically depressed," McInerney explained that she has "definitely had bouts of depression because of this," it has had "an effect on [her] home life," and her personality has changed in that she has "definitely lost confidence" and is "not as secure as [she] used to be with who [she is]." Id. at 1820-21.

While McInerney's testimony "about her emotional suffering was not exceedingly graphic or detailed, it could constitute substantial evidence when considered in conjunction with the totality of the circumstances surrounding [her] claim." Smith, 129 F.3d at 1416. The emotional toll of McInerney's termination was substantial not only because it ended her career as a management veteran with a company for whom she had worked since she was 23 years old, JA at 1818, but also because it had a stressful impact on her already difficult situation which involved caring for her prematurely-born son who was in critical condition, and recovering from her own pregnancy-related complications. Further, "the context of the [retaliatory] behavior [is] also relevant to the award of damages in this case." Smith, 129 F.3d at 1417; cf. also Fitzgerald, 68 F.3d at 1265 (determining that a damages award was excessive based, in part, on the context of the discriminatory behavior). McInerney's persistent requests for an unpaid leave of absence were denied by ramp supervisors who were aware of her severe personal circumstances and who managed a department which could have functioned in her absence. United decided that McInerney resigned when that leave was denied and she did not return to work when her leave was not extended. The district court did not abuse its discretion in denying United's motion for a new trial based on excessive damages.

29

V

*Punitive Damages*

McInerney appeals the district court's refusal to submit the issue of punitive damages to the jury. At the close of McInerney's case-in-chief, the district court stated it was "not going to submit punitive damages in this case. So, you haven't supported a claim for punitive damages." JA at 1995.

We decline to consider whether the district court erred in refusing to submit the punitive damages issue to the jury because any error would have no effect on McInerney's damages award. The district court reduced the jury's compensatory damages award to $300,000, which is the statutory limit provided in 42 U.S.C. § 1981a(b)(3)(D). This limit applies to the combined sum of compensatory and punitive damages. See id. ("The sum of the amount of compensatory damages awarded under this section . . . and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party . . . $300,000," for an employer of United's size.); see also Haynes v. Williams, 88 F.3d 898, 901 (10th Cir. 1996) ("[T]he Civil Rights Act of 1991 limited the amount of monetary recovery under Title VII . . . by placing caps on the total amount of compensatory and punitive damages that could be awarded to any complaining party." (quoting U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1281 (7th Cir. 1995))). Thus, even if the jury would have awarded punitive damages to McInerney, her total compensatory and punitive recovery would still be limited to the $300,000 she was, in fact, awarded. Cf. Johnson v. Spencer Press of Me.,

Inc., 364 F.3d 368, 377-78 (1st Cir. 2004) (determining that the availability of punitive damages was not a "live issue" where the compensatory damage award alone exceeded the statutory cap and, therefore, "the award would have been the same regardless of whether the jury awarded any punitive damages").

## VI

### *Front Pay*

McInerney also appeals the district court's denial of front pay. Front pay is "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001). We review the district court's decision regarding the award of front pay for an abuse of discretion. Smith, 298 F.3d at 964. In this case, the parties stipulated that reinstatement of McInerney would not be appropriate. JA at 2351. Although front pay may be appropriate when reinstatement is not possible, it is not a mandatory remedy. Starrett v. Wadley, 876 F.2d 808, 824 (10th Cir. 1989). "The amount of front pay, if any, is set in the court's discretion." McInnis v. Fairfield Cmtys., Inc., 458 F.3d 1129, 1145 (10th Cir. 2006) (internal quotation omitted). The following factors are relevant in assessing such an award:

> work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which the plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value.

31

In formulating a front-pay award the district court may consider all evidence presented at trial concerning the individualized circumstances of both the employee and employer, but it must avoid granting the plaintiff a windfall.

Id. at 1146 (quoting Whittington v. Nordam Gp., Inc., 429 F.3d 986, 1000-01 (10th Cir. 2005)).

After her employment at United ended on March 31, 2006, McInerney began to look for other employment in May 2006. At that time, finding a position in the airline industry was not a priority for her; McInerney was looking for any type of position that would offer her flexibility. JA at 2404. As of January 2008, McInerney had applied for only two jobs in the airline industry, and those applications were for customer service positions. Id. at 2405-06. In January 2007, McInerney accepted a position with a healthcare business doing insurance billing. Id. at 2407. The position allowed her to work from home. Id.

McInerney contends that she is entitled to front pay because her "long career was wiped out, and she was not made whole for the damage thereto, particularly as she inevitably would suffer continuing harm well into the future." McInerney Opening Br. at 74. From McInerney's briefs and the record, it is not clear what exactly McInerney sought in front pay, although it appears she calculated front pay "based upon an average of the past four years raises . . . ." JA at 2453. McInerney also appears to have sought several years of United flight benefits for herself and her family, and the value of potential promotions she claims for which she would have applied. At the hearing,

32

United argued that McInerney was not entitled to front pay because she did not mitigate her damages, she chose to obtain a new job at lower pay that allowed her the flexibility to work from home, and she was made whole by the jury's damages award. Id. at 2459.

The district court awarded McInerney $89,877 in back pay and stated:

> I'm not going to include anything for front pay. I'm not going to include anything for promotions or anything for the strike benefits. I don't think it's capable of calculation. And, you know, this is kind of rough and ready, but then that's the way it is with equitable remedies here. And I'm not — certainly not going to reduce the verdict below the amount that I have to reduce it to, which is the $300,000.

Id. at 2468. We conclude that the district court did not abuse its discretion in denying front pay because McInerney's attempt to calculate front pay at the hearing was inadequate. The record contains no reference to any attempt on her part to address life expectancy, continued term of employment with United, or a viable discount rate that would have supported a calculable front pay amount. See Bruso v. United Airlines, Inc., 239 F.3d 848, 862 (7th Cir. 2001) (stating that a district court does not abuse its discretion in denying a request for front pay if the plaintiff fails to provide "the essential data necessary to calculate a reasonably certain front pay award" (internal quotation omitted)). United also presented testimony that McInerney's calculation of projected average raises was inaccurate in light of United's financial situation. See JA at 2442-43 (testimony that United had not committed to providing raises in the upcoming year). Finally, the district court would have been well within its discretion to conclude that McInerney did not adequately attempt to find comparable employment. McInerney documented only two

33

attempts to find employment with other airlines, and those applications were for customer service positions. She accepted a position involving medical insurance billing that paid less than her ramp supervisor position, but allowed her the flexibility to work from home. Cf. Sellers v. Mineta, 358 F.3d 1058, 1066 (8th Cir. 2004) (holding that the district court abused its discretion in not reducing the front pay award by the amount the plaintiff could have earned if she had attempted to find comparable work). We conclude that the district court did not abuse its discretion in denying front pay.

## VII

### *Appeal-Related Attorney Fees*

McInerney's opening brief makes a request for appellate attorney fees. McInerney Opening Br. at 74. Title VII permits "the court, in its discretion, [to] allow the prevailing party . . . a reasonable attorney's fee . . . ." 42 U.S.C. § 2000e-5(k). "We have discretion to award attorney fees when we deem it appropriate, but a prevailing party is not automatically entitled to an award of attorney fees." Harsco Corp. v. Renner, 475 F.3d 1179, 1191 (10th Cir. 2007). Such an award is appropriate in this case for McInerney's successful defense of United's appeal. However, attorney fees are not appropriate for McInerney's unsuccessful cross-appeal. We, therefore, remand to the district court to determine reasonable appellate attorney fees.

The judgment of the district court is AFFIRMED. We REMAND to the district court to determine reasonable attorney fees for McInerney's defense of United's appeal.

Entered for the Court


Mary Beck Briscoe
Chief Judge

09-1423, 09-1425 - *McInerney v. United Air Lines, Inc.*

**HARTZ**, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion's affirmance of the jury's verdict in favor of Ms. McInerney on her retaliation claim. The majority opinion holds that there was sufficient evidence that Nelli retaliated against Ms. McInerney by exercising her discretion to terminate Ms. McInerney when she did not return to work after expiration of her leave. I disagree. My disagreement is ambivalent because the verdict baffles me. There was a great deal of evidence that Mortimer discriminated against Ms. McInerney because of her gender, yet the jury rejected that discrimination claim. Perhaps it was confused when it granted Ms. McInerney a verdict on the retaliation claim, which, even under the majority opinion's analysis, rested on minimal evidence. But we have no power to correct what may have been an improper verdict on the discrimination claim by affirming an improper verdict on the retaliation claim.

To begin with, I disagree that Nelli fired Ms. McInerney. Ordinarily, an employer has the right to set the duties of its employee. If the employee does not wish to perform those duties and therefore does not appear for work, the employee has abandoned the job; the employer has not terminated the employee. It does not matter that the employee would like to remain an employee on her own terms—either by performing other duties or by extending her leave. We said as much in *Lauck v. Campbell County*, 627 F.3d 805, 810 n.2 (10th Cir. 2010) (employee "abandoned" job when he "refused to report to work after his transfer"). Our opinion in *Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205 (10th Cir. 2003), is not to the contrary. First, the opinion does not expressly address

whether Wells was terminated or simply abandoned her job. The issue was not disputed. Second, the facts were rather different from our case. When Wells's leave expired, her boss terminated her without asking her to return to work. *See id.* at 1212. Here, in contrast, Ms. McInerney refused to return to work when asked.

To be sure, Ms. McInerney may have a retaliation claim even if one adopts the above view of the distinction between abandonment and termination. If, as the majority opinion states, Nelli retaliated against Ms. McInerney by refusing to exercise her authority to extend Ms. McInerney's leave, then Ms. McInerney has a cause of action. (Indeed, if her leave should have been extended, Ms. McInerney would have a constructive-discharge claim. An employee who abandons her job may be said to have been constructively terminated if she quit because the employer imposed an improper duty on her. *See Lauck*, 627 F.3d at 812. In this case the improper duty would have been that Ms. McInerney return to work.) In my view, however, the record does not support the contention that Nelli had the authority to extend Ms. McInerney's leave to the relevant extent.

There is no dispute that United's stated policy was that an employee who failed to return to work after expiration of leave was deemed to have abandoned her job. Ms. McInerney acknowledged this policy during her trial testimony. *See* J. App. at 1689–90. Perhaps Nelli had authority to ignore that policy and grant Ms. McInerney the lengthy leave of absence she desired; but the evidence does not support a finding that she had that authority. Although the majority opinion states two grounds upon which the jury could

-2-

find that the stated policy was not generally applied and that Nelli could extend Ms. McInerney's leave after its expiration, I am not persuaded.

One ground was that Nelli actually did extend Ms. McInerney's leave. Although Ms. McInerney's leave expired on March 25, 2006, Nelli waited until March 31 to deem her to have resigned. Nelli waited the extra week, however, to be sure that Ms. McInerney, whom she had not heard from, was not going to accept a position as a Customer Service Representative, which might provide another 90-day leave of absence. There is a great difference between (1) the authority to defer termination to be sure that the employee was aware of her options and had decided not to return to work, and (2) the authority to grant an employee a leave of absence of many weeks or months. Although the jury could properly have found that Nelli had the prior authority, that finding could not possibly have supported the jury's verdict, which awarded hundreds of thousands of dollars in damages. It would have availed Ms. McInerney nothing for Nelli to have extended the leave a few extra days to remove any iota of doubt that Ms. McInerney did not plan to return to work as required. What there was no evidence of is that Nelli had the authority to grant what Ms. McInerney wanted—an extended leave to care for her child. By conflating the two types of authority, the majority opinion imposes liability on United simply because it allowed Nelli a little wiggle room in enforcing company policy. We do not serve the workers of this country by issuing decisions that encourage employers to be rigid in their employment decisions.

The other ground upon which the majority opinion relies is the evidence that another worker had not been terminated for failure to come to work until he had been absent for two months. The only evidence on this matter was the following testimony by Ms. McInerney on cross-examination:

> Q. And, you certainly weren't aware of anybody who didn't show up to work and was not let go?
> A. Actually, there was a supervisor that that happened to, and it was a ramp supervisor, Marcus—I'll think of his last name in a minute. But he didn't show up to work for six weeks, and nothing was done to him for two months, no contact, no nothing.
> Q. Was he eventually fired?
> A. After two months of no contact, yes.

*Id.* at 1692.

This testimony cannot support an inference that Nelli could have granted the leave desired by Ms. McInerney. First, there was no evidence that Nelli, or even anyone in the same position as Nelli, had anything to do with the two-month delay. Second, Marcus was never permitted to return to work, as Ms. McInerney wished to do after being granted additional leave. Third, and perhaps most important, the testimony is so bereft of detail that one cannot determine whether the Marcus situation bears any material similarity to Ms. McInerney's. The gist of the majority opinion's theory is that Nelli's purported reliance on United's policy is pretext because that policy had not been applied to Marcus. We have held, however, that pretext cannot be shown by evidence that other employees were treated differently than the plaintiff unless those employees were similarly situated; and the burden was on Ms. McInerney to prove similarity. *See Hysten v. Burlington N. &*

-4-

*Santa Fe Ry. Co.*, 296 F.3d 1177, 1182 (10th Cir. 2002).  Absent that proof, one can only

speculate that the Marcus episode supports the majority opinion's theory; and we cannot

affirm a verdict based on speculation.

Accordingly, with respect and reluctance, I dissent.